**BRANSON ULTRASONICS CORP., Plaintiff,**

v.

**Kenneth STRATMAN, Defendant.**

**No. 3:96CV229 (RNC).**

United States District Court,
D. Connecticut.

Feb. 28, 1996.

John Michael Clear, Mark S. Deiermann, Bryan Cave, St. Louis, Mo, William B. Barnes, Rosenstein & Barnes, Fairfield, CT, A. Robert Fischer and Francis P. Alvarez, Jackson, Lewis, Schnitzler & Krupman, Stamford, CT, for Branson Ultrasonics Corp.

Kevin D. O'Leary, Cummings & Lockwood, Hartford, CT and Tracy C. Missett, Cummings & Lockwood, Stamford, CT, for Kenneth R. Stratman.

### RULING AND ORDER ON PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION

CHATIGNY, District Judge.

Plaintiff Branson Ultrasonics Corporation seeks a preliminary injunction against defendant Kenneth R. Stratman, Branson's former Director, Electronic Design and Development, to prevent him from violating his Covenant Not To Compete and Confidentiality Agreement ("the Agreement"). Stratman recently resigned from Branson to take a position with Dukane Corporation, Branson's principal competitor. The Agreement provides that Stratman may not work for one of Branson's competitors for a period of one year following the termination of his employment with Branson. Branson wants an injunction preventing Stratman from continuing to work at Dukane until the one year period has expired.

Branson filed this action in Connecticut Superior Court and sought a temporary re-

training order, which was denied on the papers. Stratman was ordered to show cause why a preliminary injunction should not be granted. Stratman then removed the case based on diversity of citizenship.

Branson filed its motion for a preliminary injunction along with a supporting memorandum and affidavits on February 20. Stratman filed papers in opposition on February 26. An evidentiary hearing was held on February 27.

After careful consideration of the evidence and the parties' oral and written submissions, I believe that a preliminary injunction is necessary and appropriate to protect against Stratman's use and disclosure of Branson's trade secrets and other confidential information. In accordance with Fed.R.Civ.P. 52(a), this ruling contains findings of fact and conclusions of law.

## I. *Findings of Fact*

1. Branson is a Delaware corporation with its principal place of business in Danbury, Connecticut.

2. Branson is in the business of designing, engineering, manufacturing and selling a line of products that use ultrasonics to join plastics and other materials in a wide variety of industrial applications. Ultrasonics is the use of high energy vibration to cause friction, which in turn produces heat to create a weld. Today, this process is controlled by sophisticated computer hardware and software.

3. Branson sells ultrasonic joining equipment to end-users. It also sells components to manufacturers of ultrasonic joining equipment. One of its customers is Amtech, a major manufacturer of metal welding equipment. Branson sells components to Amtech and also acts as a distributor for Amtech. Branson has customers in the United States, Europe, and Asia and faces competition in all those areas.

4. Stratman is a citizen of the State of Illinois. He is an electrical engineer who has worked in ultrasonics since 1980. Stratman was employed by Branson from August 22, 1994 until January 12, 1996 as Director, Electronic Design and Development. Prior to that time, he worked for Dukane for approximately 13 years.

5. Dukane is in the same business as Branson. Dukane is Branson's chief competitor in the United States and also competes with Branson in Europe and Asia. Dukane seeks to replace Branson as the world's largest manufacturer and supplier of ultrasonic plastics joining equipment. Like Branson, Dukane sells to end-users as well as to manufacturers of ultrasonics welding equipment. One of its customers is Ultex Corporation, a manufacturer of metal welding systems in Japan. Dukane sells components to Ultex and also acts as a distributor of Ultex's product line.

6. On January 9, 1996, Stratman informed Branson that he was resigning from his employment with Branson and returning to Dukane.

7. Stratman went to work for Branson pursuant to a written offer of employment, which is in the record as Plaintiff's Exhibit 1. The offer letter informed Stratman that "[b]y virtue of your job responsibilities, you will have access to highly confidential information and trade secrets which could cause irreparable injury to the corporation if released to competitors or others in related businesses." Stratman signed the offer letter on August 11, 1994.

8. As a condition of its offer of employment, Branson required Stratman to sign a Covenant Not To Compete and Confidentiality Agreement ("the Agreement"), which is in the record as Plaintiff's Exhibit 2. Stratman read the Agreement before signing it on August 11, 1994.

9. In paragraph II of the Agreement, Stratman agreed that during the period of his employment at Branson and for one year following termination of his employment (for any reason other than involuntary layoff), he would not enter the employ of any corporation engaged in, or desiring to enter, the business of designing, engineering, manufacturing, marketing or selling:

a. Plastics joining equipment;

b. Industrial ultrasonic and vapor degreasing cleaning equipment and related products;

c. Commercial ultrasonic cleaning equipment;

d. Ultrasonic cell disruptor equipment; and

e. Ultrasonic machine tooling equipment.

10. Before starting with Branson, Stratman also read and signed Branson's policy on confidential information, which is in the record as Plaintiff's Exhibit 3.

11. In his capacity as Branson's Director of Electronic Design and Development, Stratman was one of the leaders of a team responsible for developing a new product line of ultrasonics joining equipment known as the 1000 series. More specifically, he was the engineering leader responsible for developing new computerized controls for the 1000 series.

12. Branson has invested millions of dollars in developing the 1000 series and intends to introduce the new product line to the market later this year. Branson regards this project as its highest priority in positioning itself to compete with Dukane.

13. In the course of his employment at Branson, Stratman had access to and became familiar with confidential information concerning the 1000 series, including the core technology of the 1000 series and Branson's plans for marketing the 1000 series.

14. In his new position at Dukane, Stratman reports to Frank Link, who is president of Dukane's Ultrasonics Division. Link hired Stratman because of Stratman's engineering ability, high level of performance during his previous employment with Dukane and familiarity with Dukane's personnel, products and customers.

15. In hiring Stratman, Link knew that Stratman had signed the Agreement with Branson. Link believes that the Agreement reasonably prohibits Stratman from working for Dukane in the area of plastics joining equipment and has instructed Stratman that he is to have no direct contact with Dukane's engineers, all of whom have responsibility for developing plastics joining equipment.

16. In his new position at Dukane, Stratman is responsible for developing a market for Dukane's products in the area of metal welding. To that end, Stratman has already visited Ultex in Japan. Link expects Stratman to work closely with Ultex, call on customers, prepare product brochures, attend trade shows and assist in preparation of advertisements and press releases.

17. Though Stratman's new job at Dukane is in the area of metal welding, not plastics joining, there is significant overlap between the two. The ultrasonics technology and computerized controls that are used in joining plastics are also used in metal welding. The Dukane equipment that Stratman will be selling for use in metal welding is substantially similar to the Dukane equipment that is used to join plastics. Branson's 1000 series is designed primarily for use in joining plastics but is intended to be suitable for use in metal welding. Branson developed the 1000 series in consultation with a number of its customers, including Amtech, whose business consists primarily of manufacturing equipment for metal welding.

18. Stratman's new job at Dukane will require him to use his engineering expertise. Link expects Stratman to work with the engineers at Ultex in addressing customer requirements. Link expects Stratman to share with the engineers at Ultex any ideas he might have for product improvements. Moreover, although Link has instructed Stratman to have no direct contact with Dukane's engineers, if Stratman and the engineers at Ultex want to consult with Dukane's engineers, the Ultex engineers will communicate with the engineers at Dukane. Such communication has occurred with regularity in the past, included Stratman when he was previously at Dukane and is likely to occur again. Stratman will be in regular contact with Link, who is in charge of Dukane's ultrasonics division, which encompasses both plastics joining and metal welding.

19. In the course of his new employment at Dukane, opportunities will arise for Stratman to use and disclose confidential information he gained while at Branson. His familiarity with the controls of the 1000 series will enable him to evaluate and compare the relative strengths and weaknesses of the controls made by Dukane. In addressing customer requirements with engineers at Ultex,

he will be in a position to use and disclose what he knows about the 1000 series. The Ultex engineers will then be in a position to communicate that information to engineers at Dukane. In his conversations with Link, he will also have opportunities to use and disclose Branson's trade secrets and confidential information. Stratman's use and disclosure of this information might well be unintentional. Nevertheless, it is likely, if not inevitable, that such use and disclosure will occur. For Branson to detect any such use or disclosure would be nearly impossible.

20. Before rejoining Dukane, Stratman applied for positions at Kimberly Clark Corporation and Motorola Corporation, both users of ultrasonics joining technology and equipment. Numerous other companies use ultrasonics in industrial applications. Given Stratman's professional credentials, it is reasonable to expect that he could obtain employment with such a company.

21. If Stratman is enjoined from continuing to work at Dukane for the balance of the one year term contained in the Agreement, Link will help him find another job and will try to get Dukane to continue to pay him. Dukane will postpone its effort to develop a market for its product line for use in metal welding. Link estimates that this delay could result in substantial financial loss to Dukane.

## II. *Conclusions Of Law*

1. The Court has subject matter jurisdiction based on diversity of citizenship.

2. Connecticut law applies.

3. To obtain a preliminary injunction, Branson must show (1) irreparable harm and (2) either (a) a likelihood of success on the merits or (b) the existence of sufficiently serious questions on the merits to make them a fair ground for litigation, combined with a balance of hardships tipping decidedly in its favor.

4. The covenant not to compete contained in the Agreement was knowingly entered into by Stratman for adequate consideration.

5. Connecticut courts will enforce a covenant not to compete if the covenant is reasonable considering the following five factors: (1) the length of time the restriction is in effect; (2) the geographical scope of the restriction; (3) the fairness of the protection afforded the employer; (4) the extent of the restraint on the employee's ability to pursue his occupation; and (5) the extent of any interference with the public interest. *Robert S. Weiss & Assocs., Inc. v. Wiederlight,* 208 Conn. 525, 528 n. 2, 546 A.2d 216 (1988).

6. Applying this five-factor test, the covenant at issue here is reasonable: (1) the restriction lasts only one year; (2) the geographic scope of the restriction is not overly broad in light of Branson's international marketing activities; (3) Branson is entitled to rely on the covenant to ensure that Stratman, its key engineer on the 1000 series, will not use or disclose its trade secrets while working for a competitor during the very year that the 1000 series will be introduced; (4) other employment opportunities are available to Stratman that will enable him to continue to use his expertise in ultrasonics; and (5) enforcement of the covenant will not harm the public interest.

7. Stratman's employment by Dukane violates the plain terms of the covenant.[1]

8. Enforcement of the covenant is necessary to prevent irreparable harm. Loss of trade secrets is not measurable in money damages. See *Computer Assoc. International, Inc. v. Bryan,* 784 F.Supp. 982, 986 (E.D.N.Y.1992). When, as here, a high degree of similarity between an employee's former and current employment makes it likely that the former employer's trade secrets and other confidential information will be used and disclosed by the employee in the course of his new work, enforcement of a

---

**1.** Stratman testified that he did not think the Agreement would prevent him from returning to work at Dukane. However, the covenant flatly prohibits the employee from working for a corporation engaged in the business of designing, engineering or selling the products listed in the covenant. Stratman's testimony that he did not understand this when he signed the covenant is difficult to credit.

covenant not to compete is necessary to protect against such use and disclosure. See *Continental Group, Inc. v. Kinsley*, 422 F.Supp. 838, 844–45 (D.Conn.1976) (Newman, J.) (enforcing 18 month covenant by enjoining employment with direct competitor).

■ 9. Though the issue need not be reached, the balance of hardships tips decidedly in favor of Branson. If the covenant is not enforced, it is likely that Branson will lose the benefit of its trade secrets and other confidential information concerning the 1000 series. Branson will have no adequate remedy at law. If the covenant is enforced, Stratman will not be able to work at Dukane for the balance of the one year term set forth in the covenant. Interfering with his employment in this way is a serious matter. However, Link will try to help Stratman get other employment and there are other opportunities available to him in ultrasonics. Link will also try to arrange for Dukane to continue to pay Stratman while he looks for work. If Stratman does not accept permanent employment elsewhere, there is no evidence that he will not be able to resume working for Dukane when the one year period expires approximately eleven months from now.

### III. *Conclusion*

For the foregoing reasons, Branson's motion for a preliminary injunction is granted. Stratman is hereby enjoined from continuing to work at Dukane pending the entry of a final judgment in this case, expiration of the one year period contained in the covenant not to compete, or further order of this court, whichever occurs first.

So ordered.