[No. G028382. Fourth Dist., Div. Three. Sept. 12, 2002.]

J. DOUGLAS WHYTE et al., Plaintiffs, Cross-defendants and
Respondents, v.
SCHLAGE LOCK COMPANY, Defendant, Cross-complainant and
Appellant;
INGERSOLL-RAND COMPANY, Defendant and Appellant.

1444

**COUNSEL**

Fisher & Phillips, John M. Polson, Robert Yonowitz and John E. Lattin IV for Defendant, Cross-complainant and Appellant and for Defendant and Appellant.

Sonnenschein Nath & Rosenthal, Martin J. Foley, Michael E. Pappas and Azniv Ksachikyan for Plaintiffs, Cross-defendants and Respondents.

**OPINION**

**FYBEL, J.**—The doctrine of inevitable disclosure permits a trade secret owner to prevent a former employee from working for a competitor despite the owner's failure to prove the employee has taken or threatens to use trade secrets. Under that doctrine, the employee may be enjoined by demonstrating the employee's new job duties will inevitably cause the employee to rely upon knowledge of the former employer's trade secrets. No published California decision has accepted or rejected the inevitable disclosure doctrine.

In this opinion, we reject the inevitable disclosure doctrine. We hold this doctrine is contrary to California law and policy because it creates an after-the-fact covenant not to compete restricting employee mobility.

This holding leads us to affirm the trial court's order denying the application of Schlage Lock Company (Schlage) for a preliminary injunction and granting the motion of J. Douglas Whyte (Whyte) and Kwikset Corporation (Kwikset) to dissolve a temporary restraining order. We reach the issue of inevitable disclosure because we conclude certain information Schlage seeks to protect does constitute trade secret, but the evidence presented below, viewed (as it must be) through the lens of the applicable standard of review, fails to establish actual or threatened misappropriation.

## FACTS

Schlage is a subsidiary of defendant Ingersoll-Rand Company (Ingersoll-Rand). Kwikset and Schlage manufacture and sell locks and related products. They are fierce competitors and vie intensely for shelf space at The Home Depot, which is the major seller of locks and alone accounts for 38 percent of Schlage's sales.

Whyte worked as Schlage's vice-president of sales and was responsible for sales to The Home Depot and other "big box" retailers such as Home-Base, Lowe's, Menard's, and Sears. Whyte signed a confidentiality agreement to protect Schlage's proprietary information and agreed to abide by Schlage's code of ethics, which forbids disclosure of confidential information for personal or noncompany uses. Whyte did not sign a covenant not to compete.

The Home Depot periodically conducts a review of its suppliers' product lines, prices, pricing and marketing concessions, and ability to deliver product. The Home Depot uses this "line review" to determine which products it will sell and which products to remove from its shelves. As part of the line review, The Home Depot usually asks vendors, such as Kwikset and Schlage, to submit proposals for pricing and marketing concessions and for the amount of promotional discounts and advertising funds, and to present information about product changes and new products.

The Home Depot conducted a line review with Schlage in February 2000. The Home Depot followed Schlage's recommendation to remove Kwikset's Titan brand of locks and to expand Schlage's presence on its shelves. Whyte participated in the line review and in drafting the line review agreement confirming the business relationship between Schlage and The Home Depot.

Whyte's sales abilities impressed Kwikset's president, Christopher Metz. Metz realized Whyte "was killing my team," and asked him "what it would take to get him to leave Ingersoll-Rand . . . ." Whyte apparently got what it took, for he accepted a position with Kwikset on June 3, 2000. He did not resign from Schlage, however, until June 14—after participating on behalf of Schlage in confidential meetings with The Home Depot on June 5.

Whyte departed Schlage on June 16, 2000. Schlage was not pleased with Whyte, and the parting was not amicable. Schlage contends Whyte left to revenge belittling comments made by Schlage's president, Robert Steinman, and contends Whyte disavowed a confidentiality agreement, stole trade secret information (including a copy on computer disk of the line review agreement with The Home Depot), and lied about returning company information. Whyte denies taking any trade secrets, claims he reaffirmed the confidentiality agreement, and contends that in the exit interview on June 16 Steinman vowed to destroy his career.

On June 25, 2000, Whyte became Kwikset's vice-president of sales for national accounts. His job duties at Kwikset are substantially similar to those at Schlage: handling the lock products account for The Home Depot and other "big box retailers."

### PROCEEDINGS BELOW

Whyte's defection to Kwikset ignited a firestorm of litigation. Ingersoll-Rand sued Whyte in Colorado state court, seeking an injunction against him. Ingersoll-Rand urged the Colorado state court to issue an injunction based upon the doctrine of inevitable disclosure. The Colorado court denied the request for an injunction on June 27, 2000.

Whyte then filed this suit against Ingersoll-Rand and Schlage on June 30, 2000. Whyte sought, among other things, damages for interference with contract and a declaration of his freedom to work for Kwikset.

On July 11, 2000, Schlage filed a cross-complaint for unfair competition, misappropriation of trade secrets, breach of contract, breach of fiduciary duty, intentional and negligent interference with economic relations, and conversion. The next day, Schlage brought an ex parte application to restrain Whyte temporarily from using or disclosing trade secrets, pending a hearing on an application for a preliminary injunction. The court granted the ex parte application on July 25 and issued a temporary restraining order enjoining Whyte from using or disclosing 20 categories of trade secret information and ordering Whyte to return any such information in his possession. In response, Whyte turned over a kitchen-sized garbage bag of shredded documents and a Ziploc bag containing seven destroyed "floppy" disks and nine destroyed "zip" disks.

The court permitted expedited discovery, and rapid-fire discovery ensued. The results of this discovery, as well as declarations, exhibits, and briefs were submitted in support of and in opposition to the application for preliminary injunction. At the first hearing on the application, the court rejected the inevitable disclosure doctrine, but took the matter under submission to consider issuing an injunction based upon actual or threatened misappropriation.

The parties submitted additional declarations, exhibits, requests for judicial notice, and briefs before the next hearing. Whyte filed a motion to dissolve the temporary restraining order, which Schlage opposed.

At a second hearing on October 24, 2000, the court stated it would deny the application for an injunction. In announcing the ruling, the court stated the information Schlage sought to protect was not trade secret: "I don't think these things rise—I don't think these are trade secrets." The court reflected, "I think Mr. Whyte should be able to go about his business," but added, "[c]ertainly if it is proven somehow that he used specific information, well, there is money damages."

Later on October 24 the court entered a minute order denying the preliminary injunction and granting Whyte's motion to dissolve the temporary restraining order without stating its reasons. Schlage then filed (and withdrew) a lengthy motion for reconsideration.

Schlage and Ingersoll-Rand appealed from the October 24 order. Although Ingersoll-Rand did not cross-complain for injunctive relief and did not bring or join in the application for a preliminary injunction, it is a party to the complaint and is sufficiently aggrieved by the order to have standing to appeal. (Code Civ. Proc., § 902; *County of Alameda v. Carleson* (1971) 5 Cal.3d 730, 736 [97 Cal.Rptr. 385, 488 P.2d 953].) The trial court denied Schlage's application for a stay pending appeal, and we denied Schlage's petition for writ of supersedeas.

STANDARD OF REVIEW

■ Injunctions in the area of trade secrets are governed by the principles applicable to injunctions in general. (*Hilb, Rogal & Hamilton Ins. Services v. Robb* (1995) 33 Cal.App.4th 1812, 1820, fn. 4 [39 Cal.Rptr.2d 887].) ■ "In deciding whether to issue a preliminary injunction, a trial court weighs two interrelated factors: the likelihood the moving party ultimately will prevail on the merits, and the relative interim harm to the parties from the issuance or nonissuance of the injunction." (*Hunt v. Superior Court*

(1999) 21 Cal.4th 984, 999 [90 Cal.Rptr.2d 236, 987 P.2d 705].) " 'Generally, the ruling on an application for preliminary injunction rests in the sound discretion of the trial court. The exercise of that discretion will not be disturbed on appeal absent a showing that it has been abused. [Citations.]' " (*Ibid.*) Denial of a preliminary injunction will be upheld on appeal if the trial court did not abuse its discretion with respect to either the question of success on the merits or the question of irreparable harm. (*Cohen v. Board of Supervisors* (1985) 40 Cal.3d 277, 286-287 [219 Cal.Rptr. 467, 707 P.2d 840]; *Hart v. Cult Awareness Network* (1993) 13 Cal.App.4th 777, 785 [16 Cal.Rptr.2d 705].)

Whether the trial court granted or denied a preliminary injunction, the appellate court does not resolve conflicts in the evidence, reweigh the evidence, or assess the credibility of witnesses. (*Hilb, Rogal & Hamilton Ins. Services v. Robb, supra,* 33 Cal.App.4th at p. 1820.) " '[T]he trial court is the judge of the credibility of the affidavits filed in support of the application for preliminary injunction and it is that court's province to resolve conflicts.' " (*Ibid.*) Thus, even when presented by declaration, "if the evidence on the application is in conflict, we must interpret the facts in the light most favorable to the prevailing party and indulge in all reasonable inferences in support of the trial court's order." (*Ibid.*)

Schlage acknowledges the abuse of discretion standard of review, but misapplies it. Schlage focuses upon the trial court's comments made during the October 24, 2000 hearing that the information Schlage sought to protect was not trade secret. Based on those oral comments, Schlage argues the trial court denied the injunction for that reason alone, and therefore abused its discretion by failing (1) to address Schlage's request for an injunction under the theory of misappropriation of confidential information, (2) to reach the issue of actual or threatened misappropriation, and (3) to balance the hardships in denying the injunction.

We cannot presume, however, the trial court ended its analysis with its determination of no trade secrets or that its oral comments reflect all of its reasons for denying the injunction. The trial court denied the preliminary injunction in a minute order without explanation. We review that order, not the court's reasons. (E.g., *Davey v. Southern Pacific Co.* (1897) 116 Cal. 325 [48 P. 117]; *Caro v. Smith* (1997) 59 Cal.App.4th 725, 735 [69 Cal.Rptr.2d 306].) ■ The trial court was not required to prepare a statement of decision or explain its reasoning: "The denial of a preliminary injunction does not require any statement of decision or explanation." (*Metro Traffic Control, Inc. v. Shadow Traffic Network* (1994) 22 Cal.App.4th 853, 858 [27 Cal.Rptr.2d 573].) "[T]he fact that the court's conclusion is set forth in

summary fashion does not mean the court failed to engage in the requisite analysis, or that its analysis was incorrect." (*City of Los Altos v. Barnes* (1992) 3 Cal.App.4th 1193, 1198 [5 Cal.Rptr.2d 77].) For purposes of appellate review, we therefore presume the court considered every pertinent argument and resolved each one consistently with its minute order denying the preliminary injunction.

Because we review the correctness of the order, and not the court's reasons, we will not consider the court's oral comments or use them to undermine the order ultimately entered. (Cf. *Selfridge v. Carnation Co.* (1962) 200 Cal.App.2d 245, 249 [19 Cal.Rptr. 310] ["oral opinions or statements of the court may not be considered to reverse or impeach the final decision of the court which is conclusively merged in its findings and judgment"]; *Birch v. Mahaney* (1955) 137 Cal.App.2d 584, 588 [290 P.2d 579] ["remarks made by a trial judge during a trial or argument, or even an opinion filed by him, cannot be used to impeach a formal decision, order or judgment later made or entered"].) Here, where the trial court was not required to prepare a statement of decision or explain its reasons for denying the injunction, it is especially important to refrain from using the court's oral comments as a basis for reversal. In that situation, reviewing the trial court's oral comments would in effect require the trial court either to prepare a statement of decision where none is required or to say nothing during argument to avoid creating grounds for impeaching the final order. We decline to place the trial courts in such an untenable position.

DISCUSSION

I.

*Is the Appeal Moot?*

Before turning to the merits, we address Whyte's suggestion that the appeal is moot because Schlage's trade secret information has become "stale." Schlage responds that most of the trade secret information has a "useful shelf-life" of two years so that "[m]ost of the information delineated in items 1(a) through 1(t) of the TRO . . . is current today."

An appeal becomes moot when an event occurs which, through no fault of the respondent, renders any appellate decision ineffective in providing the parties relief. (*Eye Dog Foundation v. State Board of Guide Dogs for the Blind* (1967) 67 Cal.2d 536, 541 [63 Cal.Rptr. 21, 432 P.2d 717]; *Woodward Park Homeowners Assn. v. Garreks, Inc.* (2000) 77 Cal.App.4th 880, 888 [92 Cal.Rptr.2d 268].) An injunction against misappropriation of trade secrets

should "only last as long as is necessary to preserve the rights of the parties" and "as long as is necessary to eliminate the commercial advantage that a person would obtain through misappropriation." (*American Paper & Packaging Products, Inc. v. Kirgan* (1986) 183 Cal.App.3d 1318, 1326 [228 Cal.Rptr. 713]; see also Civ. Code, § 3426.2, subd. (a).)

Whyte cites no evidence or authority showing an injunction is no longer necessary to eliminate whatever commercial advantage he might have obtained through the alleged misappropriation. Whyte has not moved to dismiss the appeal as moot, and we find no basis to do so.

II.

*Has Schlage Sufficiently Identified Information Constituting Trade Secrets?*

A "trade secret" is "information, including a formula, pattern, compilation, program, device, method, technique, or process that: [¶] (1) Derives independent economic value, actual or potential, from not being generally known to the public or to other persons who can obtain economic value from its disclosure or use; and [¶] (2) Is the subject of efforts that are reasonable under the circumstances to maintain its secrecy." (Civ. Code, § 3426.1, subd. (d).)

Schlage sought to enjoin use of a range of alleged trade secrets, identified in paragraph 1 of the temporary restraining order as: "a. Information about Schlage's new products; b. Pricing of Schlage's products sold to its customers; c. Profit margins on Schlage's products sold to its customers; d. Schlage's costs in producing the products it sells to its customers; e. The Home Depot Line Review Documents; f. Pricing concessions made by Schlage to its customers; g. Promotional discounts made by Schlage to its customers; h. Advertising allowances made by Schlage to its customers; i. Volume rebates made by Schlage on its products to its customers; j. Marketing concessions made by Schlage to its customers; k. Schlage's market research data; l. Advertising strategy plans for calendar year 2000; m. Trade Discounts made by Schlage to its customers; n. Payment terms offered by Schlage to its customers and offered by Schlage's vendors/suppliers to Schlage; o. Rebate Incentives made by Schlage to its customers; p. Schlage's advertising, sales and promotion budgets; q. Finishing processes for new and existing Schlage products; r. Composite material process technologies (i.e., the unique composite materials used by Schlage in its products and the processes applied to those composite materials); s. Schlage's 1, 3 and 5 year strategic plan documents; t. Schlage's personnel information . . . ."

Whyte contends these "broad" categories of business information are not described with sufficient particularity to deserve trade secret protection. He also contends, as the trial court stated orally, that none of these categories of information constitutes trade secrets. Schlage argues (1) it has described its trade secrets with the required specificity and (2) the information Schlage has identified is trade secret and Schlage made reasonable efforts to maintain the information's secrecy. We discuss these contentions in turn, and conclude, based upon the evidence submitted, that some of the information Schlage sought to protect was trade secret.

Our decision regarding trade secret status is based upon the appellate record and is not a final adjudication on the merits. (*Cohen v. Board of Supervisors, supra,* 40 Cal.3d 277, 286; *Hilb, Rogal & Hamilton Ins. Services v. Robb, supra,* 33 Cal.App.4th at p. 1820.) The ultimate determination of trade secret status is subject to proof presented at trial.

A. *Whether Schlage Sufficiently Identified Its Trade Secrets*

With the exception of category 1a (Schlage's new product information), we conclude Schlage identified its trade secrets with the requisite specificity. At this stage, a party seeking to protect trade secrets must "describe the subject matter of the trade secret with sufficient particularity to separate it from matters of general knowledge in the trade or of special knowledge of those persons who are skilled in the trade, and to permit the defendant to ascertain at least the boundaries within which the secret lies." (*Diodes, Inc. v. Franzen* (1968) 260 Cal.App.2d 244, 253 [67 Cal.Rptr. 19].)

Categories 1b through 1s of the temporary restraining order meet this requirement. They are drafted with sufficient detail to permit Whyte to identify and understand the protected information. Schlage's descriptions made pursuant to Code of Civil Procedure section 2019, subdivision (d), in supplemental briefing, and in declarations remove any doubt about the "boundaries within which the secret[s] lie[]." (*Diodes, Inc. v. Franzen, supra,* 260 Cal.App.2d at p. 253.)

Kwikset had no difficulty in understanding the scope of the putative trade secret information. In deposition, Kwikset's president (Christopher Metz) was asked, one by one, whether each category of information from the temporary restraining order was confidential. Metz understood the scope and meaning of each category because he testified such information was confidential to Kwikset and he had no reason to believe it was not confidential to Schlage.

Category 1a, regarding Schlage's new product information, is too broad. Although information about a company's new products certainly can be trade secret, (*Vacco Industries, Inc. v. Van Den Berg* (1992) 5 Cal.App.4th 34, 49-51 [6 Cal.Rptr.2d 602]), "[i]nformation about Schlage's new products" is too broad to enforce because it does not differentiate between truly secret information (such as formulas and product design) and new product information which has been publicly disclosed. Schlage does not address whether the information in category 1t—Schlage's personnel information—is sufficiently described or constitutes trade secrets, and so that argument is waived. (*Huntington Landmark Adult Community Assn. v. Ross* (1989) 213 Cal.App.3d 1012, 1021 [261 Cal.Rptr. 875].)

### B.    *Whether the Information Identified by Schlage Is Trade Secret*

■ The test for trade secrets is whether the matter sought to be protected is information (1) which is valuable because it is unknown to others and (2) which the owner has attempted to keep secret. (*ABBA Rubber Co. v. Seaquist* (1991) 235 Cal.App.3d 1, 18 [286 Cal.Rptr. 518].)

We first address Schlage's efforts to maintain the confidentiality of its trade secrets. "[R]easonable efforts to maintain secrecy have been held to include advising employees of the existence of a trade secret, limiting access to a trade secret on 'need to know basis,' and controlling plant access." (Legis. Com. com., 12A West's Ann. Civ. Code (1997 ed.) foll. § 3426.1, p. 239; see also *Courtesy Temporary Service, Inc. v. Camacho* (1990) 222 Cal.App.3d 1278, 1288 [272 Cal.Rptr. 352].)

■ The record shows that Schlage's trade secrets are, with one significant exception, not publicly disseminated and are subject to a confidentiality agreement signed by Schlage executives, including Whyte. Requiring employees to sign confidentiality agreements is a reasonable step to ensure secrecy. (*MAI Systems Corp. v. Peak Computer, Inc.* (9th Cir. 1993) 991 F.2d 511, 521.) Further, Kwikset considers such information to be confidential.

The exception is category 1e—The Home Depot line review documents. It does not appear Schlage maintained the confidentiality of the line review documents because they were disclosed to The Home Depot. Schlage asserts the line review documents and related information are subject to a secrecy agreement between Schlage and The Home Depot. But, as Schlage conceded at oral argument, a secrecy agreement is not in the record. Without a secrecy agreement, The Home Depot presumably could give the line review documents to Kwikset and other Schlage competitors. Because a secrecy agreement is not in the record, for purposes of this appeal we do not treat as trade

secret or confidential information the line review documents, as well as any other information disclosed to The Home Depot. For the same reason, any information (such as price concessions, trade discounts and rebate incentives) disclosed to Schlage customers cannot be considered trade secret or confidential for purposes of this appeal.

Thus, we conclude, based upon the appellate record, Schlage made reasonable efforts to maintain the secrecy of its trade secret information, except for The Home Depot line review documents and other information disclosed to The Home Depot or other Schlage customers.

We next address whether the information Schlage seeks to protect derives value from being unknown to others. We review below the categories of information identified by Schlage in the temporary restraining order (except for categories 1a, 1e and 1t) and conclude they meet this test.

    1.   *Information related to Schlage's competitive pricing and marketing of products (Categories 1b, c, d, f, g, h, i, j, m, n, and o)*

These categories identify Schlage's pricing, profit margins, costs of production, pricing concessions, promotional discounts, advertising allowances, volume rebates, marketing concessions, payment terms and rebate incentives. These categories relate to "the price that Schlage sells its lock products to its big box retailer and other non-retail customers like The Home Depot" and is used by Schlage to price its products competitively. The information in these categories has independent economic value because Schlage's pricing policies would be valuable to a competitor to set prices which meet or undercut Schlage's.

Cases have recognized that information related to cost and pricing can be trade secret. (See *Courtesy Temporary Service, Inc. v. Camacho, supra,* 222 Cal.App.3d at p. 1288 [billing and markup rates "irrefutably" of commercial value]; *SI Handling Systems, Inc. v. Heisley* (3d Cir. 1985) 753 F.2d 1244, 1260 [cost and pricing information trade secret]; *Lumex, Inc. v. Highsmith* (E.D.N.Y. 1996) 919 F.Supp. 624, 628-630 [pricing, costs, and profit margins treated as trade secrets].)

Whyte contends Schlage's cost and pricing information is merely "general methods of doing business," which cannot be protected as trade secret. (See *Fortna v. Martin* (1958) 158 Cal.App.2d 634 [323 P.2d 146] [pricing and bidding methods not trade secrets if only general methods of doing business].) In so arguing, Whyte fails to distinguish between cost and pricing data unique to Schlage (which may qualify as trade secrets) and commonly

used industry formulas for setting prices (which do not). The court in *SI Handling Systems, Inc. v. Heisley, supra,* 753 F.2d at page 1260, drew this distinction to conclude that cost and pricing information not readily known in the industry—information such as the cost of materials, labor, overhead, and profit margins—was trade secret. The cases relied upon by Whyte are inapposite for the same reason. (See *Aetna Bldg. Maintenance Co. v. West* (1952) 39 Cal.2d 198 [246 P.2d 11] [plaintiff failed to prove its procedure for estimating contracts was a secret]; *American Paper & Packaging Products, Inc. v. Kirgan, supra,* 183 Cal.App.3d 1318 [list of readily ascertainable customers not trade secret].)

2. *Schlage's strategic and marketing plans and marketing research (Categories 1k, l, p, s)*

These categories refer to the results of confidential marketing research; advertising and marketing strategy, plans, and techniques; and Schlage's five-year strategic plan. This information would be valuable if known by a competitor because it would allow the competitor to predict and counter Schlage's advertising and marketing. Schlage's marketing strategy and plans (including its five-year strategic plan) constitute trade secrets under California law. (See *Duncan v. Stuetzle* (9th Cir. 1996) 76 F.3d 1480, 1488, fn. 11.) Schlage's market research does not enjoy such blanket trade secret protection. Marketing research can be trade secret if it "explores the needs of numerous, diverse buyers," but is not protectible if it "relates to a single prominent buyer that is presumably aware of its own needs . . . ." (*SI Handling Systems, Inc. v. Heisley, supra,* 753 F.2d at p. 1259; see also *Metro Traffic Control, Inc. v. Shadow Traffic Network, supra,* 22 Cal.App.4th at pp. 863-864 [customer's preferences and requirements not trade secret].) Thus, Schlage's marketing research is not trade secret if it relates solely to The Home Depot's, or any one prominent customer's, needs.

3. *Information related to Schlage's process technologies (Categories 1q and r)*

The information in these categories includes specific casting technology, flow technology, manufacturing technologies, and Schlage's electroplating and plating bath chemistries and methods. Whyte does not contend Schlage's process technologies are not trade secret, and indeed such technical "know-how" is the quintessential trade secret. (See Civ. Code, § 3426.1, subd. (d) [trade secrets include formulas, methods, techniques, or processes]; *Vacco Industries, Inc. v. Van Den Berg, supra,* 5 Cal.App.4th 34, 49-51; *Surgidev Corp. v. Eye Technology, Inc.* (D.Minn. 1986) 648 F.Supp. 661, 687 and cases cited at fn. 8; 1 Milgrim, Trade Secrets (2002) § 1.09[1][b], [2][c], [3], pp. 1-377 to 1-378.1, 1-384 to 1-393.)

C. *Schlage's Other Theories*

We do not reach Schlage's alternative argument the trial court abused its discretion in failing to issue an injunction under either a breach of confidence theory or under Business and Professions Code section 17200 because we have concluded Schlage did identify information constituting trade secret. Because no secrecy agreement appears in the record, for purposes of the appeal The Home Depot line review documents cannot be deemed confidential and therefore cannot form the basis of a breach of confidence theory. Our conclusion below that the evidence does not establish actual or threatened misappropriation also disposes of those alternative grounds for injunctive relief.

III.

*Did Whyte Engage in Actual or Threatened Misappropriation?*

We turn to the issue whether Whyte engaged in actual or threatened misappropriation. The court may enjoin "[a]ctual or threatened misappropriation" of a trade secret. (Civ. Code, § 3426.2, subd. (a).) "Misappropriation" is, generally speaking, improper acquisition of a trade secret or its nonconsensual use or disclosure. (Civ. Code, § 3426.1, subd. (b); see also *Morlife, Inc. v. Perry* (1997) 56 Cal.App.4th 1514, 1523 [66 Cal.Rptr.2d 731].)

Schlage contends direct and circumstantial evidence established Whyte engaged in actual or threatened misappropriation, including evidence that Whyte had access to its trade secrets, vowed to get even with Schlage's president, concealed his planned departure from Schlage to attend confidential meetings with The Home Depot, renounced his confidentiality agreement, lied about returning confidential information, lied about destroying Schlage confidential information, retained a copy of The Home Depot line review agreement downloaded onto disk, sent an e-mail attaching a confidential report to his personal e-mail address, and accepted a position with Kwikset with duties identical to those at Schlage in order to use Schlage's confidential information.

Whyte denies these charges. He argues nobody at Schlage testified to having personal knowledge that he misappropriated or threatened to misappropriate trade secrets. Whyte points to evidence showing that before he resigned from Schlage, he destroyed everything he had containing Schlage confidential information, and that he downloaded The Home Depot line review agreement at the request of Schlage's vice-president of marketing

and left the disk on the vice-president's desk. In any event, Whyte disclaims any knowledge of Schlage's manufacturing technologies and processes. Whyte asserts that Kwikset instructed him not to disclose any Schlage trade secrets. Several Kwikset managers testified Whyte had disclosed no Schlage trade secrets.

The evidence is neatly divided. Both sides marshal declarations, exhibits, and deposition transcripts in support of their respective positions. But we need not, and cannot, resolve the conflicts in the evidence or reweigh it. The applicable standard of review dictates that we "interpret the facts in the light most favorable to the prevailing party and indulge in all reasonable inferences in support of the trial court's order," even though the evidence is presented by declaration. (*Hilb, Rogal & Hamilton Ins. Services v. Robb, supra,* 33 Cal.App.4th at p. 1820.) The trial court judges the credibility of the declarations. (*Ibid.*) Accordingly, we must interpret the facts favorably to the order denying a preliminary injunction, and therefore conclude the evidence established Whyte did not threaten to or actually misappropriate Schlage's trade secrets.

We emphasize our decision is not a final adjudication of the issue of actual or threatened misappropriation (*Cohen v. Board of Supervisors, supra,* 40 Cal.3d 277, 286; *Hilb, Rogal & Hamilton Ins. Services v. Robb, supra,* 33 Cal.App.4th at p. 1820), and we have serious concerns over evidence in the record suggesting Whyte took Schlage's trade secrets or destroyed evidence. We are constrained, however, by the applicable standard of review and our limited role as a reviewing court to view the facts in favor of the trial court's order.

## IV.

### *Is the Inevitable Disclosure Doctrine the Law of California?*

As an alternative to proof of actual or threatened misappropriation, Schlage urges us to reverse and enjoin Whyte from working for the lock division of Kwikset under the doctrine of inevitable disclosure. Under the doctrine of inevitable disclosure, "a plaintiff may prove a claim of trade secret misappropriation by demonstrating that defendant's new employment will inevitably lead him to rely on the plaintiff's trade secrets." (*PepsiCo, Inc. v. Redmond* (7th Cir. 1995) 54 F.3d 1262, 1269 (*PepsiCo*).) The inevitable disclosure doctrine results in an injunction prohibiting employment, not just use of trade secrets. The doctrine's justification is that unless the employee has "an uncanny ability to compartmentalize information" the employee will necessarily rely—consciously or subconsciously—upon

knowledge of the former employer's trade secrets in performing his or her new job duties. (*Id.* at p. 1269.)

Courts applying the doctrine of inevitable disclosure have considered the degree of similarity between the employee's former and current positions, the degree of competition between the former and current employers, the current employer's efforts to safeguard the former employer's trade secrets, and the former employee's "lack of forthrightness both in his activities before accepting his job . . . and in his testimony." (*PepsiCo, supra,* 54 F.3d at p. 1267; see also *Merck & Co. Inc. v. Lyon* (M.D.N.C. 1996) 941 F.Supp. 1443, 1460.)

*PepsiCo* is the leading case on inevitable disclosure. There, PepsiCo sought to enjoin its former employee, William Redmond, from working for a competitor, the Quaker Oats Company. PepsiCo and Quaker Oats were fierce competitors, particularly in "sports drinks" and "new age drinks." (*PepsiCo, supra,* 54 F.3d at pp. 1263-1264.) Redmond's high position at PepsiCo gave him access to its trade secrets regarding these products, including strategic plans, product innovations, "pricing architecture," selling and delivery innovations, and marketing " 'attack plans.' " (*Id.* at pp. 1264-1265.) To protect these trade secrets, PepsiCo had Redmond sign a confidentiality agreement. Quaker Oats courted Redmond, and he ultimately accepted a high-level position in that company. (*Id.* at p. 1264.) When Redmond resigned from PepsiCo, it immediately sought and obtained an injunction preventing him from assuming his duties at Quaker Oats. (*Id.* at p. 1265.)

PepsiCo did not contend Quaker Oats actually stole trade secrets, but asserted Redmond "cannot help but rely on [PepsiCo's] trade secrets as he helps plot [Quaker Oats'] new course." (*PepsiCo, supra,* 54 F.3d at p. 1270.) The Seventh Circuit Court of Appeals agreed and applied the Illinois Trade Secrets Act to affirm an injunction preventing Redmond from working for Quaker Oats. (*Id.* at pp. 1270-1271.) The Seventh Circuit first concluded that Illinois law permits a court to enjoin employment based upon inevitable disclosure of trade secrets. (*Id.* at p. 1269.) The Seventh Circuit then agreed with the district court finding that "unless Redmond possessed an uncanny ability to compartmentalize information, he would necessarily be making decisions about [Quaker Oats' products] by relying on his knowledge of [PepsiCo's] trade secrets." (*Ibid.*) Such inevitability of disclosure, coupled with Redmond's and Quaker Oats' "lack of candor on their part and proof of their willingness to misuse [PepsiCo's] trade secrets," led the Seventh Circuit to affirm the injunction barring Redmond from working for Quaker Oats. (*Id.* at pp. 1270-1271.)

Schlage asserts the facts here are "strikingly similar" to *PepsiCo*'s, and we are inclined to agree. Schlage and Kwikset are fierce competitors; Whyte's job duties at Kwikset are virtually identical to those he had at Schlage; Whyte knew of Schlage's trade secrets (in particular, those important to The Home Depot account); Whyte signed a confidentiality agreement; and, if we are to believe Schlage's evidence, Whyte was not "forthright" with Schlage. Whyte's evidence did show Kwikset made efforts to safeguard Schlage's trade secrets. Nonetheless, the similarity between this case and *PepsiCo* and other inevitable disclosure cases means we cannot distinguish those cases on the facts.

No published California decision has accepted or rejected the doctrine of inevitable disclosure. Two federal district courts in California recently concluded inevitable disclosure is not the law of this state. (*Globespan, Inc. v. O'Neill* (C.D.Cal. 2001) 151 F.Supp.2d 1229, 1235 (order by Baird, J.) ["The Central District of California has considered and rejected the inevitable disclosure doctrine"]; *Bayer Corp. v. Roche Molecular Systems, Inc.* (N.D.Cal. 1999) 72 F.Supp.2d 1111, 1120 (order by Alsup, J.) ["California trade-secrets law does not recognize the theory of inevitable disclosure"]; but see Note, *Intellectual Slavery?: The Doctrine of Inevitable Disclosure of Trade Secrets* (1996) 26 Golden Gate U. L.Rev. 717, 719 ["Because California has adopted the [Uniform Trade Secrets Act] and because *PepsiCo* was a fact intensive analysis, this decision will affect California law"].)

These federal decisions do not, of course, establish the law of the State of California or bind its courts. We are free to consider the inevitable disclosure doctrine, and we reject it.

Our survey confirms the majority of jurisdictions addressing the issue have adopted some form of the inevitable disclosure doctrine. (E.g., *RKI, Inc. v. Grimes* (N.D.Ill. 2001) 177 F.Supp.2d 859; *H & R Block Eastern Tax Services, Inc. v. Enchura* (W.D.Mo. 2000) 122 F.Supp.2d 1067; *Maxxim Medical, Inc. v. Michelson* (S.D.Tex. 1999) 51 F.Supp.2d 773, revd. without reported opn. (5th Cir. 1999) 182 F.3d 915; *Lexis-Nexis v. Beer* (D.Minn. 1999) 41 F.Supp.2d 950, 959 [dictum because no finding of trade secrets]; *Novell Inc. v. Timpanogos Research Group Inc.* (D. Utah 1998) 46 U.S.P.Q.2d (BNA) 1197, 1215 [adopting inevitable disclosure but noting "[n]o Utah appellate court has considered . . . the application of this doctrine"]; *Merck & Co. Inc. v. Lyon, supra*, 941 F.Supp. 1443; *Branson Ultrasonics Corp. v. Stratman* (D.Conn. 1996) 921 F.Supp. 909 [invoking inevitable disclosure to enforce covenant not to compete]; *Surgidev Corp. v. Eye Technology, Inc., supra*, 648 F.Supp. 661; *Bendinger v. Marshalltown Trowell Co.* (1999) 338 Ark. 410 [994 S.W.2d 468]; *E.I. duPont de Nemours*

*& Co. v. American Potash & Chemical Corp.* (1964) 41 Del.Ch. 533 [200 A.2d 428]; *Strata Marketing, Inc. v. Murphy* (2000) 317 Ill.App.3d 1054 [251 Ill.Dec. 595, 740 N.E.2d 1166]; *National Starch and Chemical Corp. v. Parker Chemical Corp.* (1987) 219 N.J.Super. 158 [530 A.2d 31]; *Procter & Gamble Co. v. Stoneham* (2000) 140 Ohio App.3d 260 [747 N.E.2d 268]; see also Comment, *An Overview of Individual States' Application of Inevitable Disclosure: Concrete Doctrine or Equitable Tool?* (2002) 55 SMU L.Rev. 621.)

Some other courts, though agreeing with the doctrine, have distinguished it or decided their cases on other grounds. (E.g., *Padco Advisors, Inc. v. Omdahl* (D.Md. 2002) 179 F.Supp.2d 600, 611 ["inappropriate" to adopt the doctrine because no tangible trade secrets were taken]; *Hoskins Mfg. Co. v. PMC Corp.* (E.D.Mich. 1999) 47 F.Supp.2d 852 [disclosure not inevitable because parties' differing technology made trade secrets useless]; *Bridgestone/Firestone, Inc. v. Lockhart* (S.D.Ind. 1998) 5 F.Supp.2d 667, 682 [finding *PepsiCo* is "instructive" but does not warrant finding of inevitable disclosure because there was no evidence the employee took confidential information]; *Lumex, Inc. v. Highsmith, supra,* 919 F.Supp. 624 [deciding case based upon noncompete covenant rather than inevitable disclosure]; *Northwest Bec-Corp v. Home Living Service* (2002) 136 Idaho 835 [41 P.3d 263] [distinguishing *PepsiCo* on ground plaintiff failed to submit evidence supporting claim of misappropriation]; *Travenol Laboratories, Inc. v. Turner* (1976) 30 N.C.App. 686 [228 S.E.2d 478] [suggesting inevitable disclosure limited to situation where employee has highly technical information]; see also Comment, *An Overview of Individual States' Application of Inevitable Disclosure: Concrete Doctrine or Equitable Tool?, supra,* 55 SMU L.Rev. 621.)

A smaller but growing band of cases rejects the inevitable disclosure doctrine. (*Globespan, Inc. v. O'Neill, supra,* 151 F.Supp.2d 1229; *Del Monte Fresh Produce Co. v. Dole Food Co., Inc.* (S.D.Fla. 2001) 148 F.Supp.2d 1326, 1337; *PSC, Inc. v. Reiss* (W.D.N.Y. 2000) 111 F.Supp.2d 252; *Bayer Corp. v. Roche Molecular Systems, Inc., supra,* 72 F.Supp.2d at p. 1120; *EarthWeb, Inc. v. Schlack* (S.D.N.Y. 1999) 71 F.Supp.2d 299; *Government Technology Services, Inc. v. IntelliSys Technology Corp.* (1999) 51 Va.Cir. 55 [1999 WL 1499548].)

The decisions rejecting the inevitable disclosure doctrine correctly balance competing public policies of employee mobility and protection of trade secrets. The inevitable disclosure doctrine permits an employer to enjoin the former employee without proof of the employee's actual or threatened use of trade secrets based upon an inference (based in turn upon circumstantial

evidence) that the employee inevitably will use his or her knowledge of those trade secrets in the new employment. The result is not merely an injunction against the use of trade secrets, but an injunction restricting employment.

Business and Professions Code section 16600 generally prohibits covenants not to compete, and California public policy strongly favors employee mobility. (*Application Group, Inc. v. Hunter Group, Inc.* (1998) 61 Cal.App.4th 881, 900 [72 Cal.Rptr.2d 73].) Business and Professions Code section 16600 protects a person's right to "follow any of the common occupations of life" (*Continental Car-Na-Var Corp. v. Moseley* (1944) 24 Cal.2d 104, 110 [148 P.2d 9]) and to pursue the " 'business or profession he may choose' " (*American Credit Indemnity Co. v. Sacks* (1989) 213 Cal.App.3d 622, 633 [262 Cal.Rptr. 92], italics omitted). We agree the doctrine of inevitable disclosure "creates a de facto covenant not to compete" and "runs[s] counter to the strong public policy in California favoring employee mobility." (*Bayer Corp. v. Roche Molecular Systems, Inc., supra,* 72 F.Supp.2d at p. 1120; accord, *Globespan, Inc. v. O'Neill, supra,* 151 F.Supp.2d at p. 1234; *PSC, Inc. v. Reiss, supra,* 111 F.Supp.2d at p. 256 [inevitable disclosure doctrine binds employee to implied-in-fact restrictive covenant that "runs counter to New York's strong public policy against such agreements"].)

The policy favoring employee mobility does not in itself, however, require rejection of the inevitable disclosure doctrine, for California law also protects trade secrets. (Civ. Code, § 3426 et seq.) ■ Nearly 40 years ago, the California Supreme Court recognized covenants not to compete are enforceable notwithstanding Business and Professions Code section 16600 if "necessary to protect the employer's trade secrets." (*Muggill v. Reuben H. Donnelley Corp.* (1965) 62 Cal.2d 239, 242 [42 Cal.Rptr. 107, 398 P.2d 147, 18 A.L.R.3d 1241] (opn. of Traynor, J.); see also *Metro Traffic Control, Inc. v. Shadow Traffic Network, supra,* 22 Cal.App.4th at p. 859.) Further, Business and Professions Code section 16600 generally does not invalidate a noncompetition agreement that merely prohibits solicitation of the former employer's customers. (*John F. Matull & Associates, Inc. v. Cloutier* (1987) 194 Cal.App.3d 1049, 1054 [240 Cal.Rptr. 211].) ■ The injunction proposed by Schlage—which only would proscribe Whyte from selling door locks to The Home Depot—appears narrowly tailored to protect Schlage's trade secrets.

The chief ill in the covenant not to compete imposed by the inevitable disclosure doctrine is its after-the-fact nature: The covenant is imposed *after* the employment contract is made and therefore alters the employment

relationship without the employee's consent. When, as here, a confidentiality agreement is in place, the inevitable disclosure doctrine "in effect convert[s] the confidentiality agreement into such a covenant [not to compete]." (*PSC, Inc. v. Reiss, supra,* 111 F.Supp.2d at p. 257.) Or, as another federal court put it, "a court should not allow a plaintiff to use inevitable disclosure as an after-the-fact noncompete agreement to enjoin an employee from working for the employer of his or her choice." (*Del Monte Fresh Produce Co. v. Dole Food Co., Inc., supra,* 148 F.Supp.2d at p. 1337; see also Matheson, *Employee Beware: The Irreparable Damage of the Inevitable Disclosure Doctrine* (1998) 10 Loyola Consumer L.Rev. 145, 162 ["the inevitable disclosure doctrine transforms employee access to trade secrets into a de facto non-competition agreement"].)

The doctrine of inevitable disclosure thus rewrites the employment agreement and "such retroactive alterations distort the terms of the employment relationship and upset the balance which courts have attempted to achieve in construing non-compete agreements." (*EarthWeb, Inc. v. Schlack, supra,* 71 F.Supp.2d at p. 311.) The result, as the *EarthWeb* court explained, is "the imperceptible shift in bargaining power that necessarily occurs upon the commencement of an employment relationship marked by the execution of a confidentiality agreement. When that relationship eventually ends, the parties' confidentiality agreement may be wielded as a restrictive covenant, depending on how the employer views the new job its former employee has accepted. This can be a powerful weapon in the hands of an employer; the risk of litigation alone may have a chilling effect on the employee." (*Id.* at p. 310.) As a result of the inevitable disclosure doctrine, the employer obtains the benefit of a contractual provision it did not pay for, while the employee is bound by a court-imposed contract provision with no opportunity to negotiate terms or consideration. (Matheson, *Employee Beware: The Irreparable Damage of the Inevitable Disclosure Doctrine, supra,* 10 Loyola Consumer L.Rev. at p. 160.)

Schlage and Whyte did not agree upon a covenant not to compete. We decline to impose one, however restricted in scope, by adopting the inevitable disclosure doctrine.

Lest there be any doubt about our holding, our rejection of the inevitable disclosure doctrine is complete. If a covenant not to compete (which would include, for example, a nonsolicitation clause), is part of the employment agreement, the inevitable disclosure doctrine cannot be invoked to supplement the covenant, alter its meaning, or make an otherwise unenforceable covenant enforceable. California law concerning enforcement of noncompetition agreements, not the inevitable disclosure doctrine, would measure the

covenant's scope, meaning, and validity. Our opinion does not change that law. Under the circumstances presented in this case, an employer might prevent disclosure of trade secrets through, for example, an agreed-upon and reasonable nonsolicitation clause that is narrowly drafted for the purpose of protecting trade secrets. Thus, regardless whether a covenant not to compete is part of the employment agreement, the inevitable disclosure doctrine cannot be used as a substitute for proving actual or threatened misappropriation of trade secrets.

Because we reject the inevitable disclosure doctrine and the evidence failed to prove actual or threatened misappropriation of trade secrets, we do not address Schlage's contention the balance of hardships weighs in favor of issuing an injunction. (*King v. Meese* (1987) 43 Cal.3d 1217, 1227 [240 Cal.Rptr. 829, 743 P.2d 889]; *Hart v. Cult Awareness Network, supra*, 13 Cal.App.4th at p. 785.)

## DISPOSITION

The order denying Schlage's application for a preliminary injunction and granting Whyte's motion to dissolve the temporary restraining order is affirmed. Whyte and Kwikset shall recover their costs on appeal.

Rylaarsdam, Acting P. J., and Bedsworth, J., concurred.