[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 19-13247

_____

D.C. Docket No. 6:18-cv-00823-CEM-DCI

JAMES P. LARWETH,
an individual,

Plaintiff-Counter Defendant-
Appellant,

versus

MAGELLAN HEALTH, INC.,
a Delaware corporation,

Defendant-Counter Claimant-
Appellee.

_____

Appeal from the United States District Court
for the Middle District of Florida

_____

(January 4, 2021)

Before MARTIN, LUCK, and BRASHER, Circuit Judges.

PER CURIAM:

James Larweth appeals the district court's preliminary injunction enforcing the restrictive covenants he agreed to in his employment agreement. After oral argument and a careful review of the record, we affirm.

## FACTUAL BACKGROUND AND PROCEDURAL HISTORY

Larweth has worked in the pharmaceutical industry for almost three decades. He started as a "drug rep" and eventually specialized in negotiating pharmaceutical rebates, which drug manufacturers offer to insurance companies to get "preferred" status for their drugs. In the early 2000's, George Petrovas started a pharmaceutical rebate management company and hired Larweth. Magellan Health, Inc., quickly purchased the company and Larweth and Petrovas became Magellan's employees. Petrovas later left Magellan and started another rebate management company. Larweth soon followed him. Magellan later purchased this new company and Larweth once again became Magellan's employee.

This time, Larweth signed an employment agreement. The agreement contained three restrictive covenants: a non-competition provision; a non-solicitation of customers provision; and a non-solicitation of employees provision. Together, they provided:

(b) Non-Competition.

2

(i) Employee covenants and agrees that during the term of his or her employment with Employer and for a period of three (3) years immediately following the termination of said employment for any reason, he or she will not, on his or her own behalf or as a partner, officer, director, employee, agent, or consultant of any other person or entity, directly or indirectly, engage or attempt to engage in the business of developing, providing or selling products or services in the United States that are products or services developed, provided or offered by Employer at the time of the termination of his or her employment with Employer, including without limitation the provision of all or any part of the services provided by Employer (directly or through subcontractors) in any way pertaining or related to pharmacy benefits management, pharmaceutical rebate management, or any other component of pharmacy benefits management services or products (whether such products or services are developed, provided or offered by such other person or entity individually or on an integrated basis with other products or services developed, provided or offered directly by such person or entity or through affiliated or subcontracted persons or entities) unless waived in writing by Employer in its sole discretion. Employee recognizes that the above restriction is reasonable and necessary to protect the interests of Employer.

\*       \*       \*

(c) <u>Non-Solicitation</u>. To protect the goodwill of Employer or the customers of Employer, Employee agrees that, for a period of three (3) years immediately following the termination of his or her employment with Employer, he or she will not, without the prior written permission of Employer, directly or indirectly, for himself or herself or on behalf of any other person or entity, solicit, divert away, take away or attempt to solicit or take away any Customer of Employer for purposes of providing or selling products or services that are offered by Employer, if Employer is then still engaged in the sale or provision of such products or services at the time of the solicitation. For purposes of this Section 7(c), "Customer" means any individual or entity to whom Employer has provided, or contracted to provide, products or services and with whom Employee had, alone or in conjunction with others, contact with, or knowledge of, during the twelve (12) months prior to

3

termination of his or her employment. For purposes of this Section 7(c), Employee had contact with or knowledge of a customer if (i) Employee had business dealings with the customer on behalf of Employer; (ii) Employee was responsible for supervising or coordinating the dealings between the customer and Employer; or (iii) Employee obtained or had access to trade secrets or confidential information about the customer as a result of Employee's association with Employer.

(d)  Non-Solicitation/Hiring of Employees.  During Employer's employment of Employee and for a period of (3) three years following the termination of Employee's employment with Employer for any reason, Employee will not, directly or indirectly, for himself or herself or on behalf of any other person or entity, solicit for employment or hire, directly or indirectly, any employee of Employer who is employed with Employer or who was employed with Employer (x) with respect to the period during Employer's employment of Employee, within the one (1) year period immediately prior to such action by Employee and (y) with respect to the three (3) year period following the termination of Employee's employment within, the one year period immediately prior to Employee's termination.

The agreement also made Larweth "eligible to participate" in Magellan's incentive bonus plans.  That part of the employment agreement provided:

Employee will be eligible to participate in Employer's benefit plans commensurate with his or her position.  Employee will receive separate information detailing the terms of such benefit plans and the terms of those plans will control.  Employee also will be eligible to participate in any annual incentive bonus plan and long-term incentive plan applicable to Employee by their terms, respectively.  Annual and long-term incentive awards, if any, will be determined and paid or granted (unless validly deferred if then permitted by Employer) between January 1 and March 15 of the year following the performance year.  During the term of this Agreement, Employee will be entitled to such other benefits of employment with Employer as are now or may later be in effect for salaried employees of Employer, and also will be

4

eligible to participate in other benefits adopted for employees at his or her level.

While at Magellan, Larweth served as the senior vice president of business development in the company's specialty pharmacy unit. He was given a "specific book of business" of Magellan's health plan customers and negotiated rebate contracts on their behalf. In this role, Larweth developed relationships with the "right individuals" at these health plans and learned their "challenges" and "needs."

Larweth had access to Magellan's confidential documents, including its "rebate tracker," which listed information about when customer contracts would expire and any "term changes," and Magellan's "summary from the manufacturing relations department," which "had all of the key information . . . needed to be able to sell to a health plan, including rebate rates and conditions" and "critical financial information." Larweth also "helped create" Magellan's "pipeline report," which "contained specific identifiable prospective business."

Magellan fired Larweth on January 5, 2018. Five months later, Larweth sued Magellan for breach of contract and several tort claims, alleging Magellan failed to pay him bonuses for his work in 2015. Larweth's counsel then emailed Magellan's counsel and said that Larweth would be "re-entering the rebate sales market immediately," he considered all customers to be "fair game," and he would be "open for business and engaged in fair, lawful competition." For about four months

5

following this email, Magellan and Larweth's attorneys went back and forth over the enforceability of the restrictive covenants and the possibility of a settlement.

In June or July of 2018, Larweth founded Anton Rx, a pharmaceutical rebate management company, and Anton Health, a company that provides focus groups and advisory boards for pharmaceutical companies and executives. Anton Rx secured contracts with at least four of Magellan's customers. Larweth also hired two former Magellan employees to work at the Anton companies.

Then, in November 2018, Magellan filed counterclaims against Larweth for breaching the restrictive covenants in his employment agreement. Magellan followed-up with a motion for preliminary injunction to enforce the restrictive covenants while the lawsuit was pending. After a two-day evidentiary hearing, the district court granted the motion. Larweth timely appealed.

## STANDARD OF REVIEW

We review a district court's decision to grant a preliminary injunction for abuse of discretion. Forsyth Cnty. v. U.S. Army Corps of Eng'rs, 633 F.3d 1032, 1039 (11th Cir. 2011). "This scope of review will lead to reversal only if the district court applies an incorrect legal standard, or applies improper procedures, or relies on clearly erroneous factfinding, or if it reaches a conclusion that is clearly unreasonable or incorrect." Id. This standard "recognizes there is a range of choice

6

within which we will not reverse the district court even if we might have reached a different decision." Id.

## DISCUSSION

In granting the motion for preliminary injunction, the district court concluded that: (1) Magellan had a substantial likelihood of success on the merits of its counterclaim against Larweth for violating the restrictive covenants; (2) the company would suffer irreparable harm if the injunction were not granted; (3) the harm to Magellan outweighed any harm the injunction would cause Larweth; and (4) the injunction was not contrary to the public interest. See Wreal, LLC v. Amazon.com, Inc., 840 F.3d 1244, 1247 (11th Cir. 2016) (setting out the elements for a preliminary injunction). Larweth contends that the district court abused its discretion as to each conclusion.

*Likelihood of Success on the Merits*

Larweth argues the district court abused its discretion in finding that Magellan was likely to succeed on the merits because: (1) Magellan's prior breach of the employment agreement precluded it from enforcing the restrictive covenants; (2) two provisions of the restrictive covenants regarding the non-solicitation of Magellan customers and the non-solicitation of Magellan employees were overbroad; and (3) the restrictive covenants were not reasonable.

1. Prior Breach Defense

7

Larweth contends that the district court "[e]rroneously [d]isregarded" his affirmative defense that Magellan breached the employment agreement first by "failing to pay him the commissions he was entitled to" under the agreement's 2015 commission plan.[1]  The district court concluded that the commission plan was an entirely separate contract and any breach of that contract did not affect Larweth's obligations under the employment agreement, including the restrictive covenants. Larweth argues that this was error because "the promise to pay certain commissions," i.e. the 2015 commission plan, "was specifically incorporated by reference" into the employment agreement.

The 2015 commission plan was not in existence when the parties entered into the employment agreement in 2014.  In Connecticut, "[w]here the document referred to is not in existence at the time the principal contract is made, the enforceability of the incorporated terms may be jeopardized." Hous. Auth. of City of Hartford v. McKenzie, 412 A.2d 1143, 1145 (Conn. Super. Ct. 1979).[2]  That is because,

---

[1] Magellan contends that Larweth didn't argue prior breach before the district court, but we disagree.  In its response to Magellan's motion for preliminary injunction, Larweth argued that under the employment agreement he "was entitled to annual bonuses" and the "2015 bonus plan was incorporated by reference into the Agreement," but Magellan "failed to pay [him] more than $1 million in accordance with the bonus plan."  Larweth argued that this failure was a material breach and barred Magellan's contract claims.  The district court expressly ruled on the issue in its order granting the motion for preliminary injunction.

[2] The employment agreement specified that "all issues relating to the validity, interpretation, and performance" of the agreement would be "governed by, interpreted, and

8

"[w]here the principal agreement contains the essential elements of a valid contract, and further binds the parties to terms to be established by one party in futuro, the danger exists that the critical elements of knowledge of, and assent to, the additional terms will be missing." Id. To satisfy those "critical elements," the parties must agree to and "sufficiently articulate[]" an "ascertainable standard" to govern the future terms. Id. at 1145–46. In other words, "[i]f the provisions to be incorporated will only explain or particularize the obligations of the parties under the principal contract, there is no obstacle to the enforcement of those supplemental provisions."

Here, the employment agreement didn't have an underlying obligation to pay commissions and there was no "ascertainable standard" to govern the future terms of potential commissions. Larweth points to this part of the employment agreement: "Employee also will be eligible to participate in any annual incentive bonus plan and long-term incentive plan applicable to Employee by their terms, respectively." But the district court correctly concluded that this language "merely provides that, by virtue of his employment, [Larweth] will be 'eligible to participate in any annual incentive bonus plan and long-term incentive plan applicable to [him]." Magellan didn't agree to pay Larweth anything; it promised only that he would "be eligible to participate" in plans that it may or may not create sometime in the future. The

---

enforced under the laws of the State of Connecticut." The parties agree that this includes the enforceability of the restrictive covenants.

"eligible to participate" language was not the kind of "ascertainable standard" required for future contracts under Connecticut law.

## 2. Overbreadth and Severability

Larweth's employment agreement had three restrictive covenants: a covenant not to compete; a covenant not to solicit certain Magellan customers; and a covenant not to solicit Magellan employees. Larweth argues that the district court impermissibly narrowed, or "blue penciled," only the last two provisions governing the non-solicitation of customers and the non-solicitation of employees by "'severing' the portions . . . that applied to the 'pharmacy benefits management' industry . . . and instead enforcing the restrictive covenants only as to the 'pharmaceutical rebate management services' industry."

Contrary to Larweth's reading of the order, the district court did not "blue pencil" the non-solicitation provisions. The district court explained that the non-solicitation of customers provision was already "very narrowly tailored to only prohibit solicitation of those customers that Larweth actually had contact with or knowledge of due to his employment with Magellan." Narrowly tailored in that way, the district court found the restriction was reasonable and did not need to be "blue penciled." As to the non-solicitation of employees provision, the district court did not "blue pencil" it because "Larweth [did] not challenge" that provision's scope.

10

The dissenting opinion says that the district court abused its discretion by "blue penciling" the non-compete provision of the restrictive covenants. But Larweth never argued that the district court erroneously "blue penciled" the non-compete provision in his appellate brief, and therefore, the issue has been abandoned. See Access Now, Inc. v. Sw. Airlines Co., 385 F.3d 1324, 1330 (11th Cir. 2004) ("Simply put, the plaintiffs' appellate brief and oral argument have not alleged that Southwest.com is itself a place of public accommodation. As such, we deem this argument abandoned and do not address its merits.").

The dissenting opinion points to one sentence on pages fourteen and fifteen of Larweth's initial brief, but the underlined heading just above that sentence is clear that he is challenging the district court's "blue penciling" of the non-solicitation provisions only:  "The non-solicitation restrictions are overbroad by the district court's own analysis, and the district court's attempt to reform them are improper." Blue Br. at 14.  Larweth doesn't mention the non-compete provision.

In the sentence immediately after the one quoted by the dissenting opinion, Larweth says again that "[t]he [district] court violated Connecticut law in its attempts to reform the non-solicitation provisions of the agreement, both as to the solicitation of customers and former employers [sic], in its efforts to solve their overbreadth." Id. at 15.  Again, no mention of the non-compete provision.  A few sentences later, in the same section of the brief, Larweth emphasizes that "[t]he district court violated

[the 'blue penciling'] rule in substantively reforming the non-solicitation provisions to address the overbreadth issue. The <u>non-solicitation</u> covenants [this is Larweth's emphasis, not ours], both as to customers and former employees, do <u>not</u> have language with respect to alternative industries that could be 'blue penciled' out." <u>Id.</u> at 16. Larweth then block quotes only the non-solicitation provisions. <u>Id.</u> at 16–17. In the last sentence of this part of the brief, Larweth concludes that the district court erred only as to the non-solicitation provisions: "The district court's legal error in attempting to reform a restriction it acknowledged was illegal is grounds for reversal of the preliminary injunction as to two of the three restrictive covenants at issue." <u>Id.</u> at 18–19.

And if there were still any doubt, Larweth explained in the "Statement of the Issues" section of his brief that "the district court erred as a matter of law in narrowing the non-solicitation covenants and holding that they were enforceable to the extent they applied to the pharmaceutical rebate management industry where the district court acknowledged that the covenants were otherwise overbroad and Connecticut law does not allow reformation of restrictive covenants, only 'blue penciling.'" <u>Id.</u> at 2. The issue, Larweth said, was the district court's reformation of the non-solicitation provisions, not the non-compete provision. Larweth abandoned the non-compete-blue-penciling issue "by failing to list or otherwise state

12

it as an issue on appeal." See Hamilton v. Southland Christian Sch., Inc., 680 F.3d 1316, 1318 (11th Cir. 2012).

### 3. Reasonableness of the Restrictive Covenants

Larweth does not dispute that he violated the restrictive covenants. But he argues that the provisions were unenforceable because they were unreasonable. "[U]nder Connecticut law, post-employment covenants are valid if reasonable under the circumstances." MacDermid, Inc. v. Raymond Selle & Cookson Grp. PLC, 535 F. Supp. 2d 308, 316 (D. Conn. 2008). Connecticut courts consider five factors in evaluating the reasonableness of a restrictive covenant: (1) "the length of time the restriction operates"; (2) "the geographical area covered"; (3) "the fairness of the protection accorded to the employer"; (4) "the extent of the restraint on the employee's opportunity to pursue his occupation"; and (5) "the extent of interference with the public's interests." Robert S. Weiss & Assocs., Inc. v. Wiederlight, 546 A.2d 216, 219 n.2 (Conn. 1988). Larweth does not challenge the reasonableness of the length of time and geographical area covered by the restrictive covenants.

### i. *Fairness of the Protection Accorded to Magellan*

Larweth argues that the "non-competition restriction . . . is not supported by either of the interests cited by the district court." Those two interests were: Magellan's investment of resources in developing its customer relationships; and Magellan's confidential pricing scheme and business strategies. Both are legitimate

13

business interests and it was fair for Magellan to protect them. See, e.g., A.H. Harris & Sons, Inc. v. Naso, 94 F. Supp. 3d 280, 297 (D. Conn. 2015) ("It is fair for A.H. Harris to protect itself, in a highly competitive market with narrow profit margins and where both pricing and personal relationships are very important, from a former employee who has specialized knowledge of its internal strategy, pricing structure and customer relations[.]").

First, Larweth contends that "the record does not support the district court's finding that Magellan had any protectable relationships" because "the identity of [Magellan's] customers was in the public domain" and he had prior relationships with certain Magellan customers. But Larweth misses the distinction between protecting the identity of customers and protecting the relationships with those customers. Magellan assigned Larweth a specific book of business and invested in his development of those customer relationships to benefit Magellan—not Larweth. Larweth admitted that, at the time of the evidentiary hearing, he had yet to secure any customers that were not Magellan customers during Larweth's time at Magellan. In other words, Larweth used his relationships with Magellan customers, developed over time using Magellan's money and resources, to get business. The district court did not abuse its discretion by finding that these relationships were a protectable business interest and that it was fair for Magellan to protect them. See Robert S. Weiss, 546 A.2d at 221 (noting that where "the employment involves . . . [the

14

employee's] contacts and associations with clients or customers it is appropriate to restrain the use, when the service is ended, of the knowledge and acquaintance, so acquired, to injure or appropriate the business which the party was employed to maintain and enlarge"); A.H. Harris, 94 F. Supp. 3d at 297 (noting "[t]he fact that there [was] a shared set of existing customers, suppliers and contractors between [the company] and [its competitor made] the restrictions at issue [there] more reasonable, not less so" (quotation marks omitted)).

Second, Larweth contends that Magellan didn't need protection from his knowledge of its pricing and business strategies because that information didn't give him "any unfair advantage in competition" and was "stale" by the time he started to compete with Magellan. But Larweth testified that his companies were successful in wooing customers because they provided more information to their customers by "engaging in completely transparent contracts" and charged lower prices than Magellan. As the district court found, to give his customers more information than Magellan did and to undercut Magellan's prices, Larweth used what he knew as Magellan's vice president about the information Magellan told its customers and how much it charged. This was a fair inference from the evidence.

Third, Larweth contends that even if Magellan had legitimate business interests in protecting relationships with its customers, the restrictive covenants unreasonably covered non-customers in the pharmaceutical rebate industry. But the

15

part of the restrictive covenants extending to potential clients was not unreasonable because, under Connecticut law, a company has a legitimate business interest in its prospective customers. See Robert S. Weiss, 546 A.2d at 221 ("The fact that an employer seeks to protect his interest in potential new customers in a reasonably limited market area as well as his existing customers at the time the employee leaves does not render the covenant unreasonable."). Here, Larweth had confidential information about the prospective customers Magellan was targeting. As vice president, he "helped create" Magellan's "pipeline report," which "contained specific identifiable prospective business."

## ii. *Restraint on Larweth's Opportunity to Pursue his Occupation*

Larweth argues that the restrictive covenants were unreasonable because they denied him the "opportunity to pursue his occupation" and he was prohibited from "participating in the pharmaceutical rebate management services industry." Under Connecticut law, "a restrictive covenant is unenforceable if by its terms the employee is precluded from pursuing his occupation and thus prevented from supporting himself and his family." Scott v. Gen. Iron & Welding Co., Inc., 368 A.2d 111, 115 (Conn. 1976).

The district court found that Larweth had "an extensive background on the pharmaceutical manufacturer side of the business, and nothing in the non-compete prohibit[ed] him from pursuing that type of employment." Larweth argues that he

16

"has not worked in the pharmaceutical benefit management space in over a decade." But under Connecticut law "occupation" isn't defined so narrowly. See Branson Ultrasonics Corp. v. Stratman, 921 F. Supp. 909, 914 (D. Conn. 1996) (finding restrictive covenant did not prevent former employee from pursuing his career in the ultrasonics industry because, with his skillset, "there [were] other opportunities available to him" in that industry). Larweth's skillset is selling pharmaceuticals. He's been in the pharmaceutical business, on both sides, for almost thirty years. Nothing in the restrictive covenants prohibited him from selling pharmaceuticals except in the niche rebate management corner of the market.

Also, Larweth didn't see his occupation as narrowly defined as the dissenting opinion defines it. After leaving Magellan, Larweth started Anton Health, which provides focus groups and advisory boards for pharmaceutical companies and executives. Anton Health's services had nothing to do with the rebate management business, and yet, this is what Larweth decided to do as part of his post-Magellan career.

The dissenting opinion says that Larweth was prevented from working in the industry he has worked in for almost three decades because "the non-compete provision—as written, without the [d]istrict [c]ourt's modifications—prohibits [him] 'from being involved with or performing any work or services, of any kind,' for all of Magellan's competitors in the 'pharmacy benefits management' industry."

17

But that's like saying that the Gators lost the football game by fourteen without the three touchdowns Trask threw to Pitts. Larweth argued to the district court that the non-compete provision was overbroad and unreasonable. The district court agreed and "blue penciled" the non-compete provision to apply only to the rebate management side of the industry. Having scored his touchdowns, and gotten the non-compete narrowed, Larweth has not been prevented from doing what he's been doing—selling pharmaceuticals.

The dissenting opinion calls for reversing the preliminary injunction based on the restraint on Larweth's opportunity to pursue his occupation, but it never explains how the restrictive covenants "prevented" Larweth "from supporting himself and his family," as required by the Connecticut Supreme Court in Scott. 368 A.2d at 115. The dissenting opinion says it doesn't have to because it is "aware of no precedent" for the requirement that a restrictive covenant must prevent an employee from supporting himself and his family to be unreasonable, and such a requirement would be "contrary to Connecticut law." But, to the extent there's any confusion about the meaning of Connecticut law and precedents, the dissenting opinion needs to look no further than the dissenting opinion. This is what it says about Connecticut law (emphasis added):

> The Connecticut Supreme Court first addressed the ability of an employee to pursue his or her occupation under a non-compete provision—the fourth reasonableness factor, Naso, 94 F. Supp. 3d at

18

293—in Scott v. General Iron & Welding Co., Inc., 368 A.2d 111 (Conn. 1976). "The interests of the employee himself must also be protected, and a restrictive covenant is unenforceable if by its terms the employee is precluded from pursuing his occupation and thus prevented from supporting himself and his family." Id. at 115.

The requirement that Larweth be prevented from supporting himself and his family, while not the "crux" of the Scott test, is a part of the test Connecticut courts apply to see whether a restrictive covenant is unreasonable.

The dissenting opinion relies on Ineo, LLC v. Lenehan, No. MMXCV186019598S, 2018 WL 1386221 (Conn. Super. Ct. Feb. 20, 2018) as "evidence[]" that the Connecticut courts don't read Scott as requiring that the restrictive covenant prevented the employee from supporting himself and his family. But Lenehan supports our reading of Scott. Lenehan confirms that "[i]t has long been the law in [Connecticut] that '[e]quity under some circumstances will hold invalid contracts which are so broad in their application that they prevent a party from carrying on his usual vocation and earning a livelihood, thus working undue hardship.'" Id. at *8 (emphasis added; third alteration in original) (quoting Mattis v. Lally, 82 A.2d 155, 157 (Conn. 1951)). In applying this test, the Lenehan court found that the employee's restrictive covenant "impose[d] a heavy burden . . . in connection with her employment and ability to make a living to support her family." Id. (emphasis added). The Lenehan court found, as required by Scott, that the employee couldn't make a living because of the restrictive covenant.

19

Here, unlike in <u>Lenehan</u>, the district court found that the restrictive covenants did "not unduly restrain Larweth's ability to pursue his employment." And here, unlike the <u>Lenehan</u> employee, the restrictive covenants still allowed Larweth to work in the pharmaceutical industry by providing focus groups and advisory boards for pharmaceutical companies and executives through his new company, Anton Health. Magellan didn't provide these services and they were not covered by the terms of the non-compete provision (before or after it was "blue penciled"). Given our record, we cannot say that the district court abused its discretion in finding that the restrictive covenants have not limited Larweth from working with Anton Health or making a living.

### iii. *Interference with the Public Interest*

Connecticut courts consider three factors to determine the reasonableness of a restrictive covenant's impact on the public interest: (1) "the scope and severity of the covenant's effect on the public interest"; (2) "the probability of the restriction creating or maintaining an unfair monopoly in the area of trade"; and (3) "the interest sought to be protected by the employer." <u>New Haven Tobacco Co. v. Perrelli</u>, 528 A.2d 865, 868 (Conn. App. Ct. 1987). Larweth argues that the district court erred because it failed to consider the second and third factors and "wholly ignored three major ways in which [he] contributed to the public interest": he negotiated steep discounts for government-sponsored health plans; he negotiated contracts for less

20

expensive "biosimilar drugs"; and he "brought a degree of transparency" to the pharmaceutical rebate market.

But the district court did consider the second and third Perrelli factors.  The district court quoted Perrelli, the same case cited by Larweth, and concluded that the restrictive covenants in this case were "not contrary to the public interest" because they "do not unreasonably deprive the public of essential goods and services" and "their enforcement would not lead to a probability that a monopoly could be created."

And while the district court didn't mention each of the three ways Larweth said that he contributed to the public interest, it didn't have to.  The district court does not have to specifically discuss and reject every argument made by the parties, as long as its findings are supported by the record.  See Stock Equip. Co. v. Tenn. Valley Auth., 906 F.2d 583, 592 (11th Cir. 1990) ("Although there must be sufficient record evidence to support the findings, [district courts] need not state the evidence or any of the reasoning upon the evidence, nor assert the negative of rejected propositions." (citations and quotations omitted)).  Here, Larweth argued to the district court the three reasons his new company contributed to the public interest.  Magellan responded that there were other companies who could do, and did, what Larweth was doing, and, therefore, his contribution was not unique and would not be missed.  The district court weighed the parties' evidence and arguments and

21

concluded that the restrictive covenants were not contrary to the public interest. We cannot say that this conclusion was an abuse of discretion.

*Irreparable Injury*

Larweth argues that the district court incorrectly applied Connecticut's rebuttable presumption of irreparable harm to evaluate whether Magellan had shown irreparable injury. And he argues that, even if there was irreparable injury, Magellan unreasonably delayed in moving for a preliminary injunction to enforce the restrictive covenants.

First, the district court did not apply Connecticut's presumption of irreparable harm to evaluate whether Magellan had shown irreparable injury. Instead, the district court acknowledged Connecticut's presumption and then made specific findings of irreparable injury, as required under Federal Rule of Civil Procedure 65. The district court accurately described Magellan's burden as having to prove that "irreparable injury [would] be suffered unless the injunction issue[d]." The district court's order makes plain that it held Magellan to that burden. After reviewing the evidence, the district court found that Magellan: "ha[d] established that it [would] suffer irreparable injury if an injunction [was] not issued"; "ha[d] established sufficient irreparable harm to support the issuance of a preliminary injunction"; and "ha[d] only shown irreparable harm insofar as [the] employees are utilized by Larweth to directly compete with Magellan in the pharmaceutical rebate market."

22

The district court didn't presume Magellan was irreparably harmed; it found that Magellan established it was injured.

Second, the district court acted within its discretion when it concluded that Magellan's delay in seeking the injunction wasn't unreasonable and didn't preclude a finding of irreparable injury. The district court considered Magellan's delay in the context of the parties' months-long discussions regarding the enforceability of the restrictive covenants and the possibility of a settlement. When those discussions broke down, Magellan filed its counterclaim and then its motion for preliminary injunction. Given this record, we cannot say that the district court's conclusion was an abuse of discretion. As we've said, while delay in seeking a preliminary injunction should be considered, it's "not necessarily fatal." See Wreal, 840 F.3d at 1248. The district court considered it but did not find it fatal.

*Balance of Interests*

As to the balance of interests, Larweth argues that Magellan has not established irreparable harm, but he has because he lost customers as a result of the injunction and the enforcement of the restrictive covenants. Larweth is wrong that Magellan did not establish irreparable harm.

The "loss of customers," we've said, is "an irreparable injury." BellSouth Telecoms., Inc. v. MCIMetro Access Transmission Servs., LLC, 425 F.3d 964, 970 (11th Cir. 2005). Here, the district court found that "Magellan ha[d] proven that

23

Larweth ha[d] actually unfairly competed with Magellan by, at least in part, using the contacts and information Larweth gained during his employment with Magellan to obtain contracts with Magellan's clients." This finding was supported by the record. Kamal Mostafa, Magellan's chief executive officer, testified that Larweth was eroding Magellan's relationship with its customers and had taken customers away from Magellan, including "HealthPartners," "CenCal," "Ascella," and "Moda."

There's no dispute that Larweth has suffered harm because of the injunction and the enforcement of the restrictive covenants. But balancing harms is a classic discretionary call and we cannot say that the district court's conclusion that the balance favored Magellan, given this record, was an abuse of discretion. See Gonzalez v. Governor of Ga., 978 F.3d 1266, 1273 (11th Cir. 2020) ("[W]e conclude that the district court did not abuse its discretion by finding that the balance of the harms and the public interest favored granting the injunction.").

*Public Interest*

Finally, Larweth argues that an injunction is not in the public interest because his new company negotiated substantial savings for government-sponsored plans, which benefits the public. But the district court's injunction doesn't prevent him from continuing his work with the government-sponsored plans. The district court carved out from its injunction "any services necessary to fulfill [Larweth]'s current

24

contractual obligations." More importantly, "the public interest calls for the[] enforcement" of valid restrictive covenants. See N.I.S. Corp. v. Swindle, 724 F.2d 707, 710 (8th Cir. 1984); MPAY Inc. v. Erie Custom Comput. Applications, Inc., 970 F.3d 1010, 1021 (8th Cir. 2020) ("The public has a strong interest in seeing that contract rights are respected." (quotation omitted; alteration adopted)). The district court's injunction enforcing Magellan's valid and reasonable restrictive covenants was not contrary to the public interest.

## CONCLUSION

For these reasons, the district court did not abuse its discretion in granting Magellan's motion for preliminary injunction and we affirm.

We end on this note. The injunction is not indefinite. Larweth's employment agreement provided that the restrictive covenants would last "for a period of three (3) years immediately following [Larweth's] termination," which was on January 5, 2018. Absent a further order from the district court following an evidentiary hearing or trial on the merits, we expect the injunction to lapse at the end of the three-year term under the employment agreement—January 5, 2021.

**AFFIRMED**.

MARTIN, Circuit Judge, dissenting:

James Larweth is a former employee of Magellan Health Inc. He appeals the District Court's order granting Magellan's motion for a preliminary injunction. That injunction restricts Mr. Larweth's ability to compete with Magellan and solicit Magellan's customers and employees. I would reverse the District Court's grant of this injunction because I believe the District Court abused its discretion in two important ways. First, the District Court found the non-compete provision was severable and modified its terms before applying the five-prong reasonableness test required under Connecticut law.[1] Second, the District Court found that the non-compete provision did not restrain Mr. Larweth's ability to engage in his occupation, when I think it clearly did. I respectfully dissent.

"When evaluating the reasonableness of covenants not to compete, Connecticut courts look to five factors: '(1) the length of time the restriction operates; (2) the geographical area covered; (3) the fairness of the protection accorded to the employer; (4) the extent of the restraint on the employee's opportunity to pursue his occupation; and (5) the extent of interference with the public's interests.'" A.H. Harris & Sons, Inc. v. Naso, 94 F. Supp. 3d 280, 293 (D. Conn. 2015) (quoting Robert S. Weiss & Assocs., Inc. v. Wiederlight, 546 A.2d

---

[1] As set out in the majority opinion, the parties' agreement calls for it to be interpreted under Connecticut law. See Maj. Op. at 9 n.2.

26

216, 219 n.2 (Conn. 1988)).  The five-prong test "is disjunctive, rather than conjunctive; a finding of unreasonableness in any one of the criteria is enough to render the covenant unenforceable."  New Haven Tobacco Co., Inc. v. Perrelli, 559 A.2d 715, 717 (Conn. App. Ct. 1989).  After reviewing restrictions in a covenant not-to-compete for reasonableness, Connecticut courts, upon finding the restrictions unreasonable, must move to the question of whether they can modify— or "blue pencil"—the original covenant to conform to a reasonable restriction.[2] The District Court failed to follow this process.

Here, the District Court erred on two parts of this analysis.  First, the District Court failed to properly apply Connecticut law when it blue penciled the original non-compete provision before performing the reasonableness analysis.  And this led to the second error.  In analyzing Mr. Larweth's ability to engage in his occupation, the District Court improperly limited "occupation" to mean the pharmaceutical rebate management industry, rather than determining whether the

---

[2] See, e.g., Timenterial, Inc. v. Dagata, 277 A.2d 512, 514 (Conn. Super. Ct. 1971) ("In view of all the evidence, the court finds that the restriction . . . is unreasonable and therefore invalid. . . . The next question is whether this court would modify the original contract to conform to a reasonable space and area restriction."); Gartner Grp. Inc. v. Mewes, No. CV91 0118332 S, 1992 WL 4766, at *4 (Conn. Super. Ct. Jan. 3, 1992) ("The question is whether such geographical limits save the covenant because they are not unreasonable and therefore, may be preserved by the blue pencil."); Ineo, LLC v. Lenehan, No. MMXCV186019598S, 2018 WL 1386221, at *9 (Conn. Super. Ct. Feb. 20, 2018) ("In deciding not to enforce the restrictive covenants of the Agreement as a whole, . . . the court declines any invitation to modify the Agreement.").

non-compete provision, as written, affected Larweth's ability to engage in his occupation.[3]

## A. MODIFICATION VIA THE BLUE-PENCIL RULE

I will begin where the District Court began—with its decision to modify the non-compete provision so that it is not overbroad. "The 'blue pencil' rule is used to strike an unreasonable restriction 'to the extent that a grammatically meaningful reasonable restriction remains after the words making the restriction unreasonable are stricken.'" Deming v. Nationwide Mut. Ins. Co., 905 A.2d 623, 638 n.21 (Conn. 2006) (quoting A.N. Deringer, Inc. v. Strough, 103 F.3d 243, 247 (2d Cir. 1996)). "A restrictive covenant which contains or may be read as containing distinct undertakings bounded by different limits of space or time, or different in subject-matter, may be good as to part and bad as to part." Id. (quoting Beit v. Beit, 63 A.2d 161, 166 (Conn. 1948). But severance is proper only if the covenant "is in effect a combination of several distinct covenants." Beit, 63 A.2d at 166 (quotation marks omitted). "Where the covenant is intended . . . to be an entirety,"

---

[3] The majority says Mr. Larweth does not argue the District Court erred by blue penciling the non-compete provision, and only challenges the two non-solicitation provisions. See Maj. Op. at 12–14. I think he did, as I read Mr. Larweth as challenging the District Court's analysis of all three provisions. See Appellant's Br. at 14–15 ("The district court, first addressing the non-competition provision, . . . concluded 'Larweth is correct, this prohibition is overbroad.' The court attempted to solve this overbreadth issue and a related problem regarding the other two covenants by 'severing' the portions of all three restrictive covenants that applied to the 'pharmacy benefits management' industry . . . ." (citation omitted) (emphasis added)).

28

it cannot be divided because this would transform the agreement into one the parties did not voluntarily enter. Id. Thus, having found that the non-compete provision precludes Mr. Larweth's ability to engage in his occupation (as described below), the court's job is to determine whether it is severable so it is not so broad.

In Beit, the plaintiffs sold their interest in three grocery stores to the defendant (two in the City of Norwich and one in the City of New London, Connecticut), and as part of the sale, agreed "not to engage in the meat market or grocery business within the limits of New London County, Connecticut, for a period of thirty years." 63 A.2d at 162. One of the plaintiffs wanted to start a grocery business in New London County and filed suit to determine the enforceability of the non-compete provision. Id. at 163. The Connecticut trial court found the non-compete provision to be unreasonable because the restriction was greater than necessary to protect defendant's business. Id. at 165. On appeal, the defendant argued the non-compete provision should at least be enforceable as to Norwich, New London, and other cities near to where defendant's business operated. Id. However, the Connecticut Supreme Court rejected this argument, holding "there can be no doubt" that the parties intended the non-compete provision to cover "all of New London county, not to a portion of it left wholly indefinite by the terms of the agreement." Id. at 166. The non-compete provision

29

was therefore not severable under the blue-pencil rule, see id. at 165–66, so it was unenforceable in its entirety, id. at 165.

In Mr. Larweth's case, the non-compete provision says he cannot "engage in the business of developing, providing or selling products or services in the United States that are products or services developed, provided or offered by" Magellan, "including without limitation" providing "any part of the services" Magellan provides "in any way pertaining or related to pharmacy benefits management, pharmaceutical rebate management, or any other component of pharmacy benefits management services or products . . . ."  The District Court found this provision, "as written, . . . is overbroad."  However, the District Court also found the non-compete provision "can be permissibly narrowed and enforced."

Noting that there is a severability and reformation provision in the Employment Agreement, the District Court found it could "permissibly sever" portions of the list of prohibited products and services.  The District Court looked to the list of "pharmacy benefits management, pharmaceutical rebate management, or any other component of pharmacy benefits management services or products." It then found that because the relevant service at issue in Mr. Larweth's Employment Agreement was pharmaceutical rebate management, it could sever the other types of business and enforce the covenant only as to Larweth's competition in the pharmaceutical rebate management services industry.  Mr.

30

Larweth says the District Court erred when it enforced the non-compete provision "only as to the 'pharmaceutical rebate management services' industry," and I think he is right. He points to the non-solicitation provisions as further proof that Magellan intended the restraints "to apply to the whole of Magellan's entire business and the broad range of health and pharmaceutical-related services" in which it engages.

I believe the District Court abused its discretion in at least two ways, by the manner in which it blue penciled the non-compete provision. First, the District Court incorrectly applied Connecticut law. Wreal, LLC v. Amazon.com, Inc., 840 F.3d 1244, 1247 (11th Cir. 2016) ("A district court abuses its discretion when . . . it applies the incorrect legal standard, or when it applies the law in an unreasonable or incorrect manner."). Instead of applying the five-prong test to determine whether the non-compete provision was reasonable as written, and then determining if any portions of the provision were severable, the District Court here did the opposite. It summarily described the covenants as "overbroad" as written, proceeded to sever portions of the non-compete provision, and then applied the reasonableness factors based on its own modification of that provision. This is wrong because if "the unreasonable provisions form the heart of the agreement," it cannot be rewritten. Sylvan R. Shemitz Designs, Inc. v. Brown, No. AANCV136013145S, 2013 WL 6038263, at *9 (Conn. Super. Ct. Oct. 23, 2013)

31

(quotation marks omitted); see also Lenehan, 2018 WL 1386221, at *9–10 (declining to apply the blue-pencil rule because of the breadth of the non-compete provision).

The Lenehan decision shows why performing this analysis in the proper sequence is important. In Lenehan, the employment agreement read:

> I shall not, within the geographic area consisting of the world, including the United States, either directly or indirectly: (i)(A) engage in any [c]ompetitive [b]usiness [a]ctivity, (B) . . . solicit business for, or otherwise be involved with any [c]ompetitor; and/or (C) perform any work or services (either as an employee, independent contractor or consultant) for any [c]ompetitor.

Lenehan, 2018 WL 1386221, at *2. After finding that the non-compete provision was too broad to enforce "as a whole," the court declined to modify the covenant because of its breadth. Id. at *9–10. The court named two considerations: (1) the non-compete provision applied not only to the employer's main competitor but all of its competitors; and (2) the employee could not take advantage of any other employment opportunities in her industry "without running afoul of the covenants." Id. at *10. In effect, the Lenehan court found that the unreasonable provision formed the heart of the agreement, so severing it was not proper. Brown, 2013 WL 6038263, at *9.

This case is similar to Lenehan because the covenant, as a whole, is too broad to enforce. Mr. Larweth's non-compete provision says he cannot:

32

directly or indirectly, engage or attempt to engage in the business of developing, providing or selling products or services in the United States that are products or services developed, provided or offered by Employer at the time of the termination of his or her employment with Employer, including without limitation the provision of all or any part of the services provided by Employer (directly or through subcontractors) in any way pertaining or related to pharmacy benefits management, pharmaceutical rebate management, or any other component of pharmacy benefits management services or products (whether such products or services are developed, provided or offered by such other person or entity individually or on an integrated basis with other products or services developed, provided or offered directly by such person or entity or through affiliated or subcontracted persons or entities).

Like in Lenehan, this non-compete provision prohibits Mr. Larweth from working with all of Magellan's competitors. Indeed, the covenant at issue here appears to be even broader than the covenant in Lenehan in that it prohibits Mr. Larweth from engaging in any business that "in any way pertain[s] or relate[s] to pharmacy benefits management," including "pharmaceutical rebate management[] or any other component of pharmacy benefits management services or products." And, as explained below, Mr. Larweth cannot take advantage of any other employment opportunities in the pharmaceutical benefit industry—in which he has been employed for the past two decades—"without running afoul" of the non-compete provision. Lenehan, 2018 WL 1386221, at *10. In effect, the non-compete provision, which is unreasonable, forms the heart of the Employment Agreement,

33

so severing it was not proper.  Brown, 2013 WL 6038263, at *9.  The District

Court thus abused its discretion by blue penciling the heart of the non-compete

provision, as opposed to invalidating it.

Second, like in Beit, I read Magellan's non-compete provision as being

intended to be an entirety and not "a combination of several distinct covenants."

Beit, 63 A.2d at 166.  This means it is not severable.  Id.  The non-compete

provision expressly covers competition in "the business of developing, providing

or selling products or services" offered by Magellan.  The fact that Magellan may

have included a list of the different facets of its business does nothing to reflect any

intention by the parties that the non-compete provision cover only the one facet—

pharmaceutical rebate management services—in which Mr. Larweth was primarily

engaged.  And I agree with Mr. Larweth that the non-solicitation provisions are

further proof that Magellan intended the non-compete provision to apply to its

entire business.  The non-solicitation of customers provision prevents Mr. Larweth

from "solicit[ing], divert[ing] away, tak[ing] away or attempt[ing] to solicit or take

away any Customer of Employer for purposes of providing or selling products or

services that are offered by Employer, if Employer is then still engaged in the sale

or provision of such products or services at the time of the solicitation."  There is

simply no language limiting solicitation to only products or services the employee

himself offered on behalf of Magellan.

34

Thus in my view, the District Court abused its discretion by modifying the covenants before ever determining whether they were reasonable, and also by failing to determine whether, under Connecticut law, the covenants were severable at all.

## B. THE EXTENT OF THE RESTRAINT ON MR. LARWETH'S OPPORTUNITY TO PURSUE HIS OCCUPATION

I also believe the District Court's analysis following its decision to modify the non-compete provision is flawed. In addressing the covenants' restraint on Mr. Larweth's ability to pursue his occupation, the District Court summarily concluded that because Larweth "has an extensive background on the pharmaceutical manufacturer side of the business, and nothing in the non-compete provision prohibits him from pursuing that type of employment," the non-compete is not too restrictive. Yet in reaching this decision, the District Court failed to look to Connecticut law to determine what it means when an employee is restricted from pursuing his occupation.

The Connecticut Supreme Court first addressed the ability of an employee to pursue his or her occupation under a non-compete provision—the fourth reasonableness factor, Naso, 94 F. Supp. 3d at 293—in Scott v. General Iron & Welding Co., Inc., 368 A.2d 111 (Conn. 1976). "The interests of the employee himself must also be protected, and a restrictive covenant is unenforceable if by its

35

terms the employee is precluded from pursuing his occupation and thus prevented from supporting himself and his family." Id. at 115. In Scott, the employee began working for the defendant employer as an apprentice welder in 1958 or 1959. Id. at 113. The employee advanced, began dealing directly with customers, and in 1971 signed a non-compete agreement in exchange for his assumption of the position of chief engineer. Id. at 113–14. The employee agreed not to manage or participate in the management of any business similar to the type of business done by his employer. Id. at 114. However, in 1972, the employee left the employer and began working for another manufacturing company as a welder. Id. Because he wanted to participate in the management of that company, he sued his former employer. Id.

In deciding whether the non-compete provision protected the employee's interests, the Connecticut Supreme Court held that the provision did not prohibit the employee "from participating in the metals business 'as an employee.'" Id. at 116. Because the employee was working within his industry as a welder, he was "not being deprived of the opportunity to earn a livelihood for himself and his family or of employment at his trade." Id. Neither did the non-compete provision "indefinitely restrict the plaintiff's right to future employment in a management position." Id. Therefore, the Connecticut Supreme Court held that the non-compete provision was reasonable. Id.

36

Mr. Larweth argues the District Court erred by finding that nothing in the non-compete provision prevented him from working in the pharmaceutical manufacturer side of the business, as opposed to the pharmaceutical rebate management industry, in which he would like to work and has spent "the last 13 years of his career."[4]  This record shows that Mr. Larweth worked for a drug company from 1994 to 2006.  At that employer, he started as a drug representative, moved up to lead a team of salespeople, and then became an account manager.  But then Mr. Larweth moved into marketing and became brand director for a diabetes drug, where one of his major responsibilities was to contract pricing strategy for health plans and, thus, manage rebate contracts.  Then for about five years, Mr. Larweth worked at another company as vice president of account management, specifically in the carve out rebate business.  After that, Mr. Larweth worked for a startup brokering rebate contracts between drug manufacturers and health plans. Finally, in his role at Magellan, which he began in 2014, Mr. Larweth acted as senior vice president of business development in the carve out rebate division. Thus, Mr. Larweth has been working in the pharmaceutical rebate management market almost his entire career.

---

[4] This finding stems from the District Court's application of the blue-pencil rule and subsequent finding that the non-compete was limited to the pharmaceutical rebate management industry.  On this record, I reject the majority's characterization that Mr. Larweth does not argue that the district court erred by blue penciling the non-compete provision.  See Maj. Op. at 12.

37

The District Court's injunction prohibits Mr. Larweth from working in this market, in which he has the most experience and has been employed for close to two decades. Therefore the injunction precludes Mr. Larweth's opportunity to pursue his occupation. Lenehan is again instructive here. Ms. Lenehan had 22 years of "significant, high-level experience" in the relocation management industry (which moves and relocates employees around the world). Lenehan, 2018 WL 1386221, at *1–2. She joined her employer in 2015 as director of global mobility and gained knowledge of the employer's products and services, customers, and software. Id. at *2. Ms. Lenehan's non-compete provision required her to agree not to "engage in any competitive business activity" anywhere in the world for a period of one year following her termination. Id. (alterations adopted). She resigned in 2017 and began working for her former employer's main competitor. Id. at *3. The court found the non-compete provision "effectively prevents her from pursuing her occupation because it prohibits her from being involved with or performing any work or services, of any kind," for "all of the [employer's] competitors in the mobility and relocation industry." Id. at *8. Notably, the court said this provision had "the practical effect of preventing [Ms. Lenehan] from working for anyone in the industry in which she has been employed for over two decades." Id.

Mr. Larweth's position is similar to that of Ms. Lenehan because, as the District Court has applied the non-compete provision to him, he cannot work for any competing company in the pharmaceutical rebate industry anywhere in the United States.  Contrary to the standards set by the District Court (and the majority here), "[t]he test for reasonableness is not whether the [employee] would be able to make a living in other ways, or in other occupations, but whether or not the Agreement as drafted and applied would unfairly restrain [his] 'opportunity' to pursue [his] occupation." Creative Dimensions, Inc. v. Laberge, No. CV116020991, 2012 WL 2548717, at *5 (Conn. Super. Ct. May 31, 2012).

Similarly, the majority opinion says Mr. Larweth's definition of "occupation" is too narrow, and points to Mr. Larweth's other company, Anton Health, as evidence that he has not been prevented from making a living.  See Maj. Op. at 18–21.  The majority's reasoning as flawed for two reasons.  First, the majority opinion's definition of occupation is mistaken, in my view.  Compare Laberge, 2012 WL 2548717, at *5 (finding that prohibition "against working in any area in which they worked" for the employer kept employees out of their entire industry "for no other reason than to prevent" competition) with R. Doc. 145 at 11 (finding that nothing in the non-compete provision prevents Mr. Larweth from working in the pharmaceutical manufacturer side of the business) and Maj. Op. at 19 ("There's nothing in the restrictive covenants prohibiting him from selling

39

pharmaceuticals except in the niche rebate management corner of the market.").
The majority thus overlooks that the non-compete provision—as written, without the District Court's modifications—prohibits Mr. Larweth "from being involved with or performing any work or services, of any kind," Lenehan, 2018 WL 1386221, at *8, for all of Magellan's competitors in the "pharmacy benefits management" industry.  As a result, this restraint on Mr. Larweth effectively prevents him from working in the industry he has worked in for almost two decades.  See supra at 12–13.  Second, the majority's reliance on Anton Health's business is misplaced in light of the District Court's finding that Anton Health and Anton Rx are co-mingled companies.  See R. Doc. 145 at 5.  And even if we did take Anton Health into consideration, the majority is wrong to say the crux of the Scott test is a showing that an employee is prevented from supporting his family.  See Maj. Op. at 20–21.  Scott said a restrictive covenant is unenforceable if the employee "is precluded from pursuing his occupation and thus prevented from supporting himself and his family."  368 A.2d at 115 (emphasis added).  Adding a second requirement that an employee must show he is prevented from supporting his family is contrary to Connecticut law, as evidenced by the Connecticut court's application of the Scott test in Lenehan, which found Ms. Lenehan was effectively prevented from pursuing her occupation because the non-compete provision "prohibits her from being involved with or performing any work or services, of any

40

kind," for "all of the [employer's] competitors in the mobility and relocation industry." Lenehan, 2018 WL 1386221, at *8 (emphasis added). In any event, interpreting the words of a contract based on a judge's view about whether an employee can otherwise support his family is also troublesome for a slew of other reasons.[5]

In sum, under the fourth factor in the test, regarding the restraint on an employee's ability to pursue his occupation, the non-compete provision is unreasonable. And, because "a finding of unreasonableness in any one of the criteria is enough to render the covenant unenforceable," the District Court abused its discretion by finding the non-compete provision is reasonable. Perrelli, 559 A.2d at 717. I would reverse the District Court and lift the preliminary injunction it imposed.[6]

---

[5] I am aware of no precedent requiring judges to evaluate contract language based upon the family make-up and/or family needs of a signatory to that contract. Surely the courts will not undertake to enforce non-compete agreements one way for an employee with small children and another for an employee who is single. This would subject businesses and their employees to the whim of courts, left to establish an entirely subjective standard for a person with no family, another for a person with family, another for a person with small children, another for a person whose children are grown, and yet others depending upon how successful any given businessperson had been in their previous business endeavors. It is the job of the courts to interpret contracts based on the language agreed upon by the parties to that contract.

[6] The restrictive covenants expire on January 5, 2021, but I believe Mr. Larweth has been harmed for the duration of time he was prohibited from doing business in the pharmaceutical rebate management industry.