Filed 6/28/21  In re R.G. CA4/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| In re R.G., a Person Coming Under the Juvenile Court Law. | |
| ORANGE COUNTY SOCIAL SERVICES AGENCY,<br><br>        Plaintiff and Respondent,<br><br>                v.<br><br>N.G.,<br><br>        Defendant and Appellant. | G059645<br><br>(Super. Ct. No. 20DP0838)<br><br>O P I N I O N |

        Appeal from a judgment of the Superior Court of Orange County, Antony C. Ufland, Judge.  Affirmed.

        Megan Turkat Schirn, under appointment by the Court of Appeal, for Defendant and Appellant.

Leon J. Page, County Counsel, Karen L. Christensen and Deborah B. Morse, Deputy County Counsel, for Plaintiff and Respondent.

\*　　　\*　　　\*

N.G. (Father), appeals from the juvenile court's dependency judgment. Father asserts the allegations made against him are either unsupported by substantial evidence, insufficient to justify jurisdiction, or both, and thus the juvenile court's order sustaining those allegations must be reversed. Father acknowledges that, in light of the unchallenged jurisdictional allegations sustained against R.G.'s mother M.M. (Mother), the reversal of the findings against him will not affect the court's judgment establishing jurisdiction; he nonetheless contends the issue is justiciable because the determination that he is an offending parent will affect his prospects in the case going forward.

We agree the appeal is justiciable but find no merit in Father's contentions. One of the sustained allegations is he has a history of domestic violence; the allegation is supported by the uncontested fact the family court issued a restraining order, protecting both R.G. and Mother, which restricted Father's contact with R.G. to supervised visitation and required him to attend a 52-week batterer intervention program. Although that order is not binding on the juvenile court, it is presumptively correct and constitutes sufficient evidence to support the sustained allegation. The sustained allegation that Father "may" have a mental illness reflects appropriate uncertainty—and concern—about that issue, and fully supports the court's order that he submit to a psychiatric evaluation under Evidence Code section 730.

Father otherwise argues each of the other sustained allegations is insufficient, standing alone, to support jurisdiction. The argument ignores the court's statement that it viewed the various sustained allegations against Father—including substance abuse and possible mental illness—to be part of a larger intertwined problem.

Having disposed of Father's challenge to the jurisdictional allegations, we conclude he waived the only objection to disposition stated in his opening brief. His sole

2

assertion is the court abused its discretion by placing R.G. in the custody of maternal relatives who live in Redlands, California, because an out-of-county placement inherently impairs his ability to visit R.G.  Father failed to make this argument below and we note the evidence in the record contradicts the conclusion he would like us to reach.  In any event, the request he did make—that a paternal aunt be evaluated for placement—was granted.

**FACTS**

In July 2019, Father filed a petition for divorce from Mother, which at the time of the hearing was still pending.  Father claimed he filed for divorce because Mother's preexisting mental problems had developed to the point she was becoming verbally abusive; she also allegedly physically attacked him once.  He claimed Mother "went off the deep end" when he filed for divorce and he became concerned she was "losing her sanity."

The couple had their first contact with the dependency system about the time the divorce petition was filed.  On July 26, 2019, there was an allegation of general neglect, due to domestic violence, against Father.  It was reported that, in April 2019, Father grabbed Mother around the neck while he screamed at her.  It was also reported there had been numerous other reports of domestic violence by Father; police records showed law enforcement had contact with the couple in the past.  Both Father and Mother denied there was any physical violence; Mother claimed she and Father had verbal disputes only, and the police records did not reflect any physical violence.  Father claimed Mother suffered from a hormonal imbalance which affects her moods.

In November of 2019, it was reported to the Orange County Social Services Agency (SSA) that Mother and Father continued to reside together despite Father serving divorce papers on Mother.  It was further reported that Father abused alcohol and marijuana on a daily basis; he vaped marijuana inside the home with 15-month-old R.G.

3

present; and he held a jar of cannabis and allowed R.G. to sniff it. Additionally, it was reported Father had been diagnosed with schizophrenia, and then schizoaffective disorder, and he was not compliant with his medications. It was also reported that Father had changed the locks on the family home while Mother and R.G. were at church, making it impossible for Mother to retrieve R.G.'s antibiotics and forcing them to seek shelter with Mother's relatives in Redlands. The report was designated as "Information Only/Inappropriate for In-Person Response."[1]

In December 2019, it was reported to SSA that both parents had subjected R.G. to emotional abuse by frequently yelling at each other in front of R.G. Further, it was reported Mother regularly left R.G. in her car, for up to 45 minutes to an hour. Father claimed Mother was "manipulative" and forced him out of the house he paid for. SSA concluded "the parents were going through a divorce at the time. Both had varying stories about possible neglect by the other parent and the child . . . (age 1) was too young to be interviewed."[2]

The following month, it was reported Mother was "squatting" with R.G. in her former residence, without access to water, electricity, or gas. When the social worker visited, she observed that all utilities were working and assessed the entire house as clean and free of safety hazards.

---

[1] When the social worker testified at the jurisdictional hearing, she seemed to suggest Mother was the source of this report. Specifically, she agreed that Mother was the source of the information that Father had been diagnosed as schizophrenic. However, the record does not identify the reporting party. Similarly, the record does not explain the significance of designating the report as "Information Only" or why it was deemed inappropriate for an in-person response.

[2] Again, the reporting party is not identified. However, SSA alleged in the petition it was the paternal grandmother, who reported Mother had left R.G. in the car alone on multiple occasions.

4

On June 17, 2020, the family court issued a restraining order against Father. The order gave sole legal and physical custody of R.G. to Mother; it allowed Father four hours of monitored visitation per week. Due to COVID-19, the visits were to be conducted via monitored video conference. The family court order also required Father to attend a 52-week batterer intervention program.

The events that prompted the petition in this case occurred about a week after the restraining order was issued. On June 23, 2020, Mother arrived at an emergency room with R.G. and reported they were living on the streets. Mother claimed R.G. had serious medical complications stemming from circumstances related to her birth, and the medical community knew something was wrong but was engaged in a conspiracy to refuse the necessary tests. It was determined Mother had taken R.G. to multiple hospitals and demanded that tests be performed against medical advice. SSA became concerned about Mother's mental health and noted there was a restraining order protecting both Mother and R.G. from Father.

On July 1, 2020, the social worker spoke to Father, who reported he was living with friends in the San Clemente/Dana Point area but declined to provide an address. Father advised the social worker any correspondence could be sent to his mother's residence. Father "denied having any mental health, substance abuse, criminal record or domestic violence history." Father claimed he had shared his concerns about Mother's mental health issues with SSA in the past and stated if it was determined R.G. was not safe in Mother's custody, his mother would be willing to care for her.

On July 9, 2020, the social worker spoke with Father about the detention hearing scheduled for July 21. He stated he planned to attend the hearing with his own attorney. He also claimed Mother would be dismissing the restraining order against him and relinquishing her rights to R.G., and his own mother would be filing for legal guardianship of R.G.

5

SSA filed a juvenile dependency petition on July 10, 2020, which was amended by interlineation on November 5, 2020. The allegations as to Father fell under Welfare and Institutions Code section 300, subdivision (b) (failure to protect).[3] The specific jurisdictional allegations against Father were (1) he may have a history of mental health problems including diagnoses of schizophrenia and schizoaffective disorder as an adolescent; (2) he and Mother have a history of domestic violence—noting that a 5-year restraining order was issued to protect both Mother and R.G. against Father on June 17, 2020; (3) he has a criminal history of an arrest and conviction for vandalism, as well as a 2019 arrest for battery; (4) he has a history of anger management problems—stating that in addition to the June 2020 restraining order, his mother had obtained restraining orders against him that spanned the years 2000 to 2003; (5) he failed to protect R.G. from Mother by seeking custody, despite being aware of Mother's mental instability; and (6) he may have an unresolved substance abuse problem which are not limited to marijuana, he works in the marijuana industry, and he encouraged R.G. to smell marijuana.[4]

On July 21, 2020, the court ordered R.G. detained, and on July 22, she was placed in the home of her maternal uncle and aunt in Redlands, California.

On July 22, 2020, the court authorized on-demand drug testing for Father and specified if he tested positive for any substance other than prescribed medication, he would be required to submit to random drug testing. On July 24, Father submitted to an on-demand test and tested positive for alcohol and cannabis. Father tested again on

---

[3]     All further statutory references are to the Welfare and Institutions Code, unless otherwise indicated.

[4]     The amended petition also alleged facts demonstrating Mother had failed to protect R.G. The original petition also alleged that Mother had subjected R.G to a risk of physical harm, in violation of section 300, subdivision (a), but that allegation was dismissed after Mother pleaded no contest to the failure to protect allegation, at the jurisdictional/dispositional hearing.

August 17, and again tested positive for cannabis—albeit at a reduced level than was recorded in the July 24 test. Father thereafter failed to comply with required on-demand drug testing, missing eight straight tests.

When interviewed by the social worker in August 2020, Father reported that he was self-employed in the business of cultivating marijuana and helping other people cultivate it. He acknowledged his history of marijuana use—stating he used it one to two times per week for stress and to help him sleep—but he claimed he had stopped using it in July 2020, after the social worker advised him to stop.

On October 19, 2020, R.G.'s caregivers reported Father visited with R.G. only twice since she had been placed in their care, and that he reported he was at a work site which did not have cellular reception to support the video conference visits.

On October 29, 2020, Father told the social worker he was focusing on work in order to provide for R.G. and that his business was beginning to flourish. He stated he had been working 12 hours per day in Desert Hot Springs, California, and had been unable to visit with R.G. because he did not have a vehicle. When the social worker asked him about his participation in the recommended services, including the court ordered drug testing, he replied his priority was to work so he could "get his child back." The social worker explained to Father that he would need to engage in the services to demonstrate he was able to care for R.G. He replied R.G.'s mother was the one with concerns, not him.

The jurisdictional hearing was held on November 5, 2020. The social worker testified she had experienced Father's anger management problem firsthand, beginning with her first phone call with him in July. He was argumentative to the point where she had to end the conversation. Father later asked his attorney to contact her and apologize. She then started communicating with Father through his attorney because Father would constantly interrupt her making it difficult to get her point across. The social worker described Father as having trouble managing his emotions. The social

7

worker was also concerned that Father's anger management issues were evidenced by his April 2019 arrest for battery and the restraining order issued against him.

The social worker testified when she asked the paternal grandmother about Father, grandmother reported he was impulsive, immature, and smoked marijuana daily. The social worker testified Father had drug tested twice, with both tests positive for marijuana; he thereafter missed approximately eight drug tests.

The social worker also noted Father's criminal history included a 2020 vandalism conviction and an April 2019 arrest for battery. The April 2019 arrest was currently an open investigation and stemmed from a domestic violence dispute between Father and Mother. The social worker acknowledged Father denied any domestic violence, and Mother had been "very vague" in describing the incident that led to Father being arrested.

After the close of evidence at the hearing, SSA requested leave to amend the petition to add an allegation that Father failed to protect R.G. from Mother because Father had acknowledged he was aware Mother was experiencing mental health issues— describing Mother as mentally unstable—but did not seek additional orders from the family court in an effort to gain custody of R.G. SSA also argued there was no reason to change the prior visitation orders made by the family court.

Father asked the court to strike the allegation related to his history of mental health problems, arguing it was unsupported by substantial evidence. He also requested the court to strike the allegation his mother had obtained a restraining order against him in 2000 because it was too remote in time to be relevant, and the allegation he and Mother had a history of domestic violence because the evidence was conflicting about whether their altercations had ever included physical violence. With respect to the restraining order issued against him in 2020, he argued there was insufficient information as to why it was issued, and thus it should not be given significant weight. He asked the court to modify the restraining order to protect Mother only because there was no

evidence that he had ever injured R.G. or that he was physically violent toward Mother in front of R.G.

Father requested the court to strike the allegation he had a conviction for vandalism in 2000 because it was too remote in time to be relevant, and to strike the allegation he had a history of anger management problems because it was not proved by a preponderance of the evidence. Father also argued that, while he had tested positive for marijuana twice, there was no evidence his drug use affects his parenting.

With respect to disposition, Father requested the court return R.G. to his custody because SSA had not met its burden of proving R.G. was at a substantial risk of harm from him. At the same time he stated he "would like his mother to have legal guardianship [over R.G.] to protect his child from Mother." Father portrayed the situation as one where the parents "have been throwing rocks at each other throughout their family law court case."

Father also argued that if the court was not willing to return R.G. to his custody, it should order SSA to assess a paternal aunt who lives in Orange County for placement, as that would better accommodate his visitation. He stated he had made efforts to visit with R.G. at her current placement, but because he could only visit on Tuesdays and R.G. was in daycare that day, they had not been able to schedule visits.

The court granted SSA's request to maintain the visitation as ordered by the family court. The court also allowed SSA to amend the petition to allege Father failed to protect R.G. from Mother, and that he was arrested for battery in April 2019.

At the same time, the court struck the allegation Father had been under a conservatorship until approximately 2013, as SSA could find no evidence to support that claim.

Having sustained the majority of the jurisdictional allegations, the court granted the petition. The court declared R.G. a dependent of the court and vested custody with SSA, which was ordered to provide both parents with family reunification services.

9

The court found Father's mental health, domestic violence, anger management and substance abuse issues were all related.  At the request of SSA, the court ordered Father to submit to an Evidence Code section 730 psychiatric evaluation to identify the appropriate services to include in his service plan.[5]

Finally, the court directed SSA to assess R.G.'s paternal aunt for placement.

**DISCUSSION**

1.    *Justiciability*

The primary thrust of this appeal is Father's challenge to the portion of the judgment sustaining specific jurisdictional allegations against him.  As Father acknowledges, reversing those sustained allegations will not cause a reversal of the juvenile court order since Mother does not challenge the jurisdictional allegations sustained against her.  (See *In re Alysha S.* (1996) 51 Cal.App.4th 393, 397 ["a jurisdictional finding good against one parent is good against both" because dependency jurisdiction attaches to the child, not the parents]; *In re J.C.* (2014) 233 Cal.App.4th 1, 3 [jurisdiction may be established based on the conduct of one parent only].)

Father nonetheless argues his contentions are justiciable because the determination that he is an offending parent will impact his rights in the dependency case going forward (*In re Drake M.* (2012) 211 Cal.App.4th 754, 762-763 (*Drake M.*)) and likely affect his rights to seek future custody of R.G. in the pending divorce case.  (See *In re J.K.* (2009) 174 Cal.App.4th 1426, 1432.)  We agree.

_____

[5]    Evidence Code section 730 states, in pertinent part:  "When it appears to the court, at any time before or during the trial of an action, that expert evidence is or may be required by the court or by any party to the action, the court on its own motion or on motion of any party may appoint one or more experts to investigate, to render a report as may be ordered by the court, and to testify as an expert at the trial of the action relative to the fact or matter as to which the expert evidence is or may be required."

10

If, as Father contends, this dependency case is grounded entirely on Mother's deteriorating mental health—which he had no reason to know about—and there is no basis to conclude R.G. should not be placed in his sole custody while Mother works toward a hoped-for reunification, that changes Father's position. He is consequently entitled to seek appellate review of those findings.

2. *Sufficiency of Jurisdictional Allegations against Father*

Section 300, subdivision (b), authorizes the juvenile court to take jurisdiction over a child in cases where the parent's failure to supervise or protect has subjected the child to serious physical harm, or a significant risk of such harm. As Father correctly contends, the risk of harm must be a current risk existing at the time of the jurisdictional hearing. (*In re Rocco M.* (1991) 1 Cal.App.4th 814, 824 ["While evidence of past conduct may be probative of current conditions, the question under section 300 is whether circumstances *at the time of the hearing* subject the minor to the defined risk of harm], abrogated on other grounds by *In re R.T.* (2017) 3 Cal.5th 622.)

Father argues that each of the jurisdictional findings made against him in this case was insufficient to satisfy the statutory standard because they were either unsupported by substantial evidence, or failed to demonstrate any current risk of harm to R.G.

a. *Domestic Violence, Criminal History, and Anger Management*

Father contends the allegations that he had (1) a history of domestic violence, (2) an arrest for battery in 2019 and a misdemeanor conviction for vandalism in 2000, and (3) a history of anger management issues which included restraining orders issued in 2000 and 2020, were insufficient to support a determination he qualified as an offending parent for purposes of jurisdiction. He argues none of those allegations, which he acknowledges are "factually accurate," is sufficient to support a finding of jurisdiction because none suggests he poses any "current" risk of harm to R.G. We disagree.

11

The court's jurisdictional findings will be upheld unless, after reviewing the entire record and resolving all conflicts in favor of the respondent and drawing all reasonable inferences in support of the judgment, the reviewing court decides there is no substantial evidence to support the findings. (*In re Monique T.* (1992) 2 Cal.App.4th 1372, 1378; *In re A.M.* (2010) 187 Cal.App.4th 1380, 1387-1388; *In re Dakota H.* (2005) 132 Cal.App.4th 212, 228.)

At the core of Father's argument is his insistence that the 2020 domestic violence restraining order—which he admits was issued against him—is of no evidentiary significance because (1) the record does not tell us what evidence was presented to obtain it, (2) he claimed Mother was able to convince the family court to issue it by relying on a series of recorded phone messages that portrayed him unfairly and falsely, and (3) he denies engaging in any domestic violence. But those contentions do not reflect how we evaluate existing court orders.

Court orders are entitled to a presumption of validity. (*Blumberg v. Mintone* (2015) 233 Cal.App.4th 1384, 1392.) Even though the juvenile court in this case is not bound by the family court's order adjudicating custody (see § 304; *A.H. v. Superior Court* (2013) 219 Cal.App.4th 1379, 1388 ["under section 304, the juvenile court has *exclusive* jurisdiction over custody and guardianship issues regarding a minor who is the subject of dependency proceedings"]), it is still entitled to presume the order was proper and supported by sufficient evidence when issued.

What that means is the juvenile court here was justified in assuming that, as of June 2020, the family court had a sufficient evidentiary basis for concluding Father had engaged in behavior that justified the issuance of a domestic violence restraining order; i.e., behavior that placed Mother "in reasonable apprehension of imminent serious bodily injury" (Fam. Code, § 6203, subd. (a)(3), (4)), or which amounted to "molesting, attacking, striking, stalking, threatening, [or] harassing." (Fam. Code, § 6320, subd. (a).) The juvenile court could also infer the family court was justified in concluding Father had

12

battered Mother because it ordered him to participate in a year-long batterer's intervention program.

Father claims the evidence Mother relied upon to support the restraining order was a compilation of videos she had recorded, allegedly without his knowledge, "for years." Although Father characterized the video as "false," he never explained how it was inaccurate and the juvenile court was not obligated to believe that claim. Thus, the juvenile court could reasonably infer that the family court restraining order was based upon "years" of videotaped evidence documenting Father's offending or threatening behavior. Such an inference is sufficient to support the finding that Father's history of domestic violence—and anger management issues—represent a substantial risk of harm to R.G.[6] (*In re John M.* (2013) 217 Cal.App.4th 410, 419 [parents' history of domestic violence evidences an ongoing pattern that presented a very real risk to the child's physical and emotional health, including the risk that violence would be directed toward the child in the future], abrogated on other grounds by *In re R.T.*, *supra*, 3 Cal.5th 622.)

Father also argues that, while the evidence of domestic violence is disputed, Mother has made inconsistent statements about whether their verbal disputes had ever devolved into physical violence and Mother is not a credible witness due to her mental health problems. While these arguments were appropriate for consideration by the juvenile court, they will not prevail on appeal. Our obligation is to indulge inferences in favor of the juvenile court's findings; we do not reweigh conflicting evidence, and we do not evaluate credibility. (*In re Marriage of Brewster & Clevenger* (2020) 45 Cal.App.5th 481 500 ["as the trier of fact, the trial court is the sole judge of the credibility and weight of the evidence; we do not judge credibility on appeal"]; *Whyte v. Schlage Lock Co.*

---

[6] The additional evidence that police had been called repeatedly when Father and Mother fought also supported this allegation. Even without confirmation of physical violence, such dangerous interactions could easily escalate, thus creating a threatening environment for a young child.

(2002) 101 Cal.App.4th 1443, 1450 [appellate court does not reassess credibility even where testimony is presented in written form].)

Father's attack on the anger management allegation fares no better. The 2020 domestic violence restraining order supports that allegation, and it is further supported by the fact Father's own mother obtained a criminal restraining order against him in 2000, as well as the evidence that he was so argumentative and uncooperative in his initial conversation with the social worker that she could not proceed, and she thereafter communicated at times through his attorney. While we might agree with Father's contention that neither of those latter facts, standing alone, would be sufficient to support a determination that his anger presents a current risk to R.G.'s physical safety, the fact is they do not stand alone.

When considered as a whole, the evidence establishes Father's anger management problem has been causing significant problems in his life for over 20 years and continues to do so. It represents a significant risk to the safety of a young child in his care.

Even the fairly remote in time allegations against Father—including his conviction for vandalism and the issuance of a criminal restraining order against him, both in the year 2000—are of significance for jurisdictional purposes. In the absence of evidence Father has acknowledged and addressed those past missteps, we cannot say they are insignificant as a matter of law. (*In re J.N.* (2010) 181 Cal.App.4th 1010, 1025-1026 ["In evaluating risk based upon a single episode of endangering conduct, a juvenile court should consider the nature of the conduct and all surrounding circumstances. It should also consider the present circumstances, which might include, among other things, evidence of the parent's current understanding of and attitude toward the past conduct . . . or other steps taken, by the parent to address the problematic conduct in the interim"].)

Although Father repeatedly attacks the specific factual allegations against him arguing they are insufficient individually to support the court's finding of jurisdiction

14

here, that approach ignores the juvenile court's explicit statement that it viewed the various sustained allegations against Father as elements of a larger intertwined problem.

b.   *Mental Health and Substance Abuse*

Father also argues the jurisdictional allegations against him relating to mental health and substance abuse are unsupported by sufficient evidence.  Father claims the "only evidence of [him] having mental illness came from [Mother's] unsupported allegation."  But the allegation is not that Father has a mental illness—it is that he "may" have a mental illness.  There is sufficient circumstantial evidence to support that allegation, including Father's lengthy history of anger management problems and restraining orders, his lack of a stable residence or employment, and his admitted use of marijuana as a regular means of calming himself and facilitating sleep.  Father's mother acknowledged to the social worker that Father "needs help" and "strongly pointed out she was not going to enable [him]."  She characterized Father as "extremely immature" and expressed concern about the extent of his marijuana use.

All of that evidence, taken together, supports the allegation that Father may have a mental illness that impairs his ability to function and to parent a young child.  It also supports the court's order that he undergo a psychiatric evaluation pursuant to Evidence Code section 730.

The juvenile court cannot order a parent to undergo a psychiatric evaluation for discovery purposes before the child is adjudged a dependent.  (*Laurie S. v. Superior Court* (1994) 26 Cal.App.4th 195, 197.)  Thus, it makes sense the court may sometimes be uncertain about whether mental illness plays a role in a parent's inability to safely care for a child.

However, once jurisdiction is established, an Evidence Code section 730 evaluation is an appropriate tool for the court to use in determining what services will be best suited for the reunification process.  (See *In re Eduardo A.* (1989) 209 Cal.App.3d 1038, 1042 ["a court-ordered psychiatric examination is aimed at determining for the

15

information of the patient and/or for the court, the patient's mental or emotional condition. It is an information-gathering tool, rather than a treatment tool"].) In this case, Father's long history of domestic violence, anger issues, and regular marijuana use to calm himself suggest the possibility of an underlying psychological problem. Identifying that problem may assist the court in deciding which services are most likely to promote Father's reunification with R.G. We find no error.

We also reject Father's contention the evidence is insufficient to support the allegation that he has an unresolved substance abuse problem. In making this argument, Father focuses on his own claim that he stopped using marijuana on July 24, 2020, when the social worker advised him to do so. He suggests this claim is borne out by the fact his second positive drug test showed substantially less cannabinoid in his system than his first drug test had.

But Father ignores that, after giving those first two positive tests, he missed the next eight of the on-demand drug tests ordered by the juvenile court. The court was entitled to treat those missed tests as positive tests, and thus to conclude that Father was less than candid about his drug use. "[A] missed drug test, without adequate justification, is 'properly considered the equivalent of a positive test result.'" (*In re Kadence P.* (2015) 241 Cal.App.4th 1376, 1384.)

The fact that Father apparently continued his drug use, but lied about it, distinguishes this case from *In re L.C.* (2019) 38 Cal.App.5th 646, and *In re Rebecca C.* (2014) 228 Cal.App.4th 720, which he relies upon. While it is true the courts in those cases found the parents' history of drug abuse (including methamphetamine) was not sufficient to support a jurisdictional finding against them, it is also true the parent in each case acknowledged the problem and displayed a commitment to addressing it—including by participating in a regimen of drug testing or treatment. (*In re L.C.*, at pp. 652-653; *In re Rebecca C.*, at p. 727.)

16

Father argues there is no substantial evidence his drug abuse poses a substantial risk of harm to R.G. (See *In re Rebecca C., supra*, 228 Cal.App.4th at p. 728 [physical harm is not presumed from a parent or guardian's substance abuse].) In D*rake M., supra*, 211 Cal.App.4th 754, the court concluded that the father's chronic use of medical marijuana posed no substantial risk of harm to his young son (*id*. at pp. 757-758); we agree that in many cases a parent's drug use, standing alone, may not pose a substantial risk to child safety.

But *Drake M*. is distinguishable because there the evidence demonstrated the father never exposed his son to his marijuana use or to any paraphernalia, always left him in the care of a responsible adult when he used marijuana, maintained regular long-term employment and a safe and stable home, and otherwise provided for the child's medical and other needs. (*Drake M*., *supra*, 211 Cal.App.4th at pp. 758-761.)

In this case, by contrast, there is evidence Father exposed R.G. to his marijuana use;[7] there is no evidence to suggest Father took any steps to ensure R.G. was properly cared for when he was using marijuana. There is also no evidence Father has maintained steady employment, or a proper home for R.G., despite his steady drug use. Father has not argued he was prepared to provide a safe and stable home for R.G. at any point following the filing of the dependency petition. Instead, he suggested initially that R.G. should be placed in the care of his mother, and more recently that his sister should be evaluated for placement.

We cannot say based on this evidence there is no support for the inference that Father's substance abuse adversely impacts his ability to care for R.G. and would

---

[7]    Father argues that this fact should be disregarded because it was "dismissed by [SSA] as" an "Information Only" report which did not require a response. However, as we have already noted, there is nothing in the record which explains the significance of the conclusion that no "in person response" was necessary. The fact the report was made suggests SSA concluded the information was significant enough to document.

pose a substantial risk to her safety if she were placed in his care. We consequently find no error in the juvenile court's decision to sustain that jurisdictional finding.

Finally, Father's attack on the allegation that he failed to protect R.G. from Mother's mental instability by seeking custody in the family court case is similarly unavailing. Father contends the allegation is based solely on the testimony of the social worker, who stated that, although Father had reported being aware of Mother's mental health and described Mother as being "mentally unstable" for the entire duration of R.G.'s life, he never gave the social worker any indication he had tried to seek custody of R.G. before the dependency case was initiated.

According to Father, that evidence is insufficient to establish he failed to seek custody of R.G. because the social worker never indicated she had asked him that question. Father asserts his failure to answer a question he was never asked cannot be used against him to establish a basis for jurisdiction.

Since we do not agree the juvenile court's conclusion was based solely on the social worker's testimony, the point is moot. The record includes evidence, reflected in one of the earlier reports to SSA, that in November 2019—approximately six months after Father filed for divorce—he changed the locks on the family home while Mother and R.G. were at church, rendering them both abruptly unable to come home. That decision is wholly inconsistent with an effort by Father to claim custody of R.G.

Additionally, by the time this dependency case was initiated, Father had taken the position that if it was officially determined R.G. could not be safely maintained in Mother's custody—a conclusion Father himself did not appear to be advocating—then his mother would be willing to seek guardianship of R.G. Father himself was not seeking custody.

We likewise are unpersuaded by Father's contention there is insufficient evidence to show he was aware that Mother's mental instability had placed R.G. at risk of harm until the dependency case was filed—and thus he cannot be faulted for failing to

18

seek custody earlier. Father contends that because he was restricted by the restraining order as of June 17, 2020, he had no way of knowing Mother was taking R.G. to various hospitals and seeking unnecessary medical tests. But the specific incident that brought R.G. to the attention of SSA is not itself the danger; it is merely a manifestation of it.

The danger to R.G. was Mother's deteriorating mental condition, and as SSA points out, there is substantial evidence Father had been aware for some time that Mother's mental health was becoming increasingly unstable. In fact, he claimed he filed for divorce because Mother had become physically violent with him, and that the divorce filing had exacerbated her instability. And yet, having decided he would no longer live with Mother's deteriorating behavior himself, he nonetheless concluded it was appropriate to leave R.G. in her care. Then he apparently decided to force the issue by locking the two of them out of the home. This evidence is sufficient to support the jurisdictional allegation.

For the foregoing reasons, we find no error in the portion of the court's order sustaining jurisdictional findings against Father.

3. *Disposition*

Father argues the court erred by placing R.G. with her maternal uncle and aunt, who live in Redlands. According to Father, he "repeatedly objected to [R.G.] being placed out of the county and asked [SSA] to consider placement with paternal aunt or paternal grandmother so [R.G.] would remain in Orange County," where Father lives.

Father claims "there [was] no information that his request was considered" and that because visitation is such a crucial element of reunification efforts, the court's failure to consider placing R.G. in Orange County "was a denial of reasonable services to [Father.]"

To the extent Father is contending the juvenile court (or SSA) has an inherent obligation to seek out and favor placement options within the confines of Orange

19

County, as an aspect of facilitating visitation, that contention is waived. Father made no such argument below. (*In re Lorenzo C.* (1997) 54 Cal.App.4th 1330, 1338.)

In any event, the record does not support Father's contention he objected repeatedly to R.G.'s placement with relatives in Redlands, and asked SSA to consider placement with R.G.'s paternal aunt or grandmother instead. Father supports his argument with a single citation to the clerk's transcript—revealing that when asked by SSA in August 2019 if he could identify any relatives who may be possibly interested in adopting R.G. if he were unable to care for her, he replied that he would like R.G. to be placed in his sister's care—as well as a citation to his closing argument at the jurisdictional and dispositional hearing. Those citations do not establish any objection to the Redlands location.

The evidence in the record also undermines Father's claim that Redlands is an unreasonable location for him to visit. While he stated in July that he was residing at a friend's house in San Clemente or Dana Point, he stated in October he was working in Desert Hot Springs—not Orange County—for 12 hours per day, six days per week. When Father acknowledged he had been unable to visit R.G., he attributed the lapse to the fact he had no vehicle, not to the fact that Redlands was an unreasonable distance from where he was spending his days.

Father did make a request at the jurisdictional hearing for an order requiring SSA to evaluate the paternal aunt as a placement option for R.G., in the event the court did not return R.G. to his custody. The court nonetheless issued the order. Given that outcome, Father has no basis for complaint on appeal. Until the paternal aunt has been evaluated and determined to be an appropriate placement option, there can be no claim the court erred by failing to place R.G. in her custody.

# DISPOSITION

The judgment is affirmed.


GOETHALS, J.

WE CONCUR:


MOORE, ACTING P. J.


FYBEL, J.